UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Coalition for Open Democracy, League of
Women Voters of New Hampshire, The
Forward Foundation, McKenzie Nykamp
Taylor, December Rust, Miles Borne, by his
next friend Steven Borne, Alexander Muirhead,
by his next friend Russell Muirhead, and Lila
Muirhead, by her next friend Russell Muirhead,

        Plaintiffs,

    vs.

David M. Scanlan, in his official capacity as
New Hampshire Secretary of State, and John
Formella, in his official capacity as New
Hampshire Attorney General,

        Defendants.

Civil Action No. 1:24-cv-00312

## **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs Coalition for Open Democracy ("Open Democracy"), League of Women Voters of New Hampshire ("LWV-NH"), and The Forward Foundation (together the "Organizational Plaintiffs"), and McKenzie Nykamp Taylor, December Rust, Miles Borne, by his next friend Steven Borne, Alexander Muirhead and Lila Muirhead, by their next friend Russell Muirhead, (together the "Individual Plaintiffs") brought this Complaint to challenge the constitutionality of the most restrictive change to New Hampshire's voting laws in recent history. Secretary of State David Scanlan and Attorney General John Formella (together the "Defendants") ask the Court to dismiss the Complaint for failure to allege standing, or, in the alternative, for failure to state a claim for which relief can be granted. *See* Mot. to Dismiss, ECF No. 36. However, Defendants' arguments ignore both well-settled law governing voting rights cases and the bulk of the Complaint's extensive factual allegations. *See* Defs.' Br., ECF No. 36-1. Those allegations specifically detail the burdens imposed by 2024 New Hampshire House Bill 1569's ("HB 1569"), how each Plaintiff is personally injured by the law, how the requested injunctive relief would remedy those injuries, and how HB 1569 violates constitutional rights. Therefore, the Plaintiffs respectfully request that the Court deny the Motion to Dismiss, ECF No. 36.

**BACKGROUND**

**I.     The Voting Process Prior to HB 1569.**

New Hampshire residents may register to vote, on or before Election Day, by establishing their identity, domicile, age, and citizenship. Compl., ECF No. 1 ¶¶ 56-57. For decades, prior to HB 1569, registrants could satisfy eligibility requirements with a Qualified Voter Affidavit, sworn under penalty of perjury and voting fraud, without providing other documents. *Id.* ¶ 58-59. The Qualified Voter Affidavit has been essential for many registrants, as not every voter has immediate access to qualifying documentation, which may be misplaced and are costly and time-consuming

-1-

to replace. *Id.* ¶ 77-82. According to legislative testimony by Defendant Secretary Scanlan, removing the Qualified Voter Affidavit for citizenship alone would affect "tens of thousands" of New Hampshire voters, if not more. *Id.* For example, Secretary Scanlan estimated there are about 45,000 foreign-born voters in New Hampshire, about 7,000 of whom have relied on the Qualified Voter Affidavit to prove their citizenship. *Id.* ¶ 66. There is no doubt that using a sworn affidavit effectively balanced ballot access with election integrity—despite over 1.5 million ballots cast in the 2016 and 2020 general elections, the state experienced virtually no voter fraud. *See id.* ¶ 62.

Separately, New Hampshire permits challenges to voter eligibility on Election Day. *Id.* ¶ 85. Prior to HB 1569, when a voter's qualifications were challenged at the polls, she could execute a Challenged Voter Affidavit, swearing under the penalties of voter fraud and perjury that she is who she claims and is qualified to vote. *Id.* Similar to the Qualified Voter Affidavit used during registration, the Challenged Voter Affidavit sufficed as proof of eligibility, without the need for additional documentation, and allowed the eligible voter to cast a regular ballot. *Id.*

Prior to HB 1569, the state enjoyed remarkably successful elections, in terms of both voter turnout and election integrity. For instance, it had the third highest turnout rates in the country for both the 2016 and 2020 presidential elections, with 70 percent or more of eligible voters participating. *Id.* ¶¶ 2, 62. Experts attribute New Hampshire's high voter turnout to the availability of Election Day registration, which was utilized by approximately 10% of the state's electorate in 2020. *Id.* ¶¶ 61-62. Claims of voter fraud are exceptionally rare, and the consensus among the state's political leaders is that voter fraud is not an issue in New Hampshire. *Id.* ¶ 62-64, 90-91.

## II. New Hampshire's Enactment of HB 1569.

Despite this history of successful election administration, Rep. Robert Lynn introduced HB 1569 in December 2023, seeking to eliminate the Qualified Voter and Challenged Voter Affidavits. Compl. ¶¶ 63, 73, 87. Immediately, even those who supported the legislation expressed

skepticism.  Rep. Lynn admitted that there was no "huge issue" of voting fraud in New Hampshire; Sen. James Gray, the Chair of the Senate's Election Law Committee, stated he did not think the bill could "withstand the court challenge"; former Gov. Sununu stated he was "not looking to make any significant changes in voting laws" when asked about the bill; and Defendant Scanlan told legislators he expected its constitutionality to be litigated if passed.  *Id.* ¶¶ 63-65.  Notwithstanding these concerns, HB 1569 passed both chambers of the legislature in May 2024, but was not signed by the governor until September 2024, pushing its effective date until after the 2024 elections.  *Id.*

HB 1569 removes the Qualified Voter Affidavit, forcing registrants to present a U.S. birth certificate, passport, or naturalization papers, which are expensive and can take months to obtain. *Id.* ¶ 73-82.  The many qualified New Hampshire residents who lack or cannot easily access those documents will face substantial hurdles and many will be unable to register to vote.  *Id.*  Anyone lacking one of the documents required by HB 1569 would be denied the ability to register same-day in New Hampshire—a key driver of turnout in the state.

Further, eliminating the Challenged Voter Affidavit will disenfranchise voters who are already registered when they attempt to cast a ballot.  A person appointed by a political party or anyone residing in the voter's ward or town, among others, may challenge any voter's eligibility to cast a ballot at the polls without forewarning.  If an election moderator subjectively determines a challenge is "more likely than not" to be "well grounded"—an undefined standard—the challenged voter is denied a ballot and is entirely disenfranchised.  HB 1569 does not provide a challenged voter with any meaningful opportunity defend themselves against surprise challenges or seek review of their erroneous disenfranchisement.  And unfair surprise is virtually guaranteed: An *already registered* voter typically does not expect to face a challenge and is unlikely to be carrying their passport or birth certificate (or proof of any of the ten bases for a challenge) with

them to vote (assuming they even have such documentation). Their only possible recourse—judicial review completed by the "close of the polls on election day"—is impractical and illusory, especially when the superior court closes hours before polling places and the process of filing a lawsuit and seeking emergency injunctive relief is costly and unfamiliar to practically all voters.

### III. Plaintiff's Challenge to HB 1569.

On September 30, 2024, Plaintiffs filed this Complaint asserting that HB 1569's elimination of the Qualified Voter and Challenged Voter Affidavits violates the First and Fourteenth Amendments. On January 16, 2025, Defendants filed the pending motion to dismiss under Rule 12(b)(1) for lack of Article III standing and under Rule 12(b)(6) for failure to state a claim. None of Defendants' arguments has merit.

## STANDARD OF REVIEW

At the motion to dismiss stage, the court must "take all of the factual allegations in the complaint as true," and all reasonable inferences are drawn in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 307-08 (1st Cir. 2024). A plaintiff "need not definitively prove [its] injury"; it simply must "plausibly plead on the face of [the] complaint" the necessary facts. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023).

## ARGUMENT

### I. Defendants' Rule 12(b)(1) Motion Fails because Each Plaintiff has Standing.

A case or controversy requires only one plaintiff with standing. *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 55 (1st Cir. 2001); *see also Horne v. Flores*, 557 U.S. 433, 446-47 (2009). Here, each of the three Organizational Plaintiffs and five Individual Plaintiffs have standing.

### A. The Organizational Plaintiffs have standing to challenge HB 1569.

An organizational plaintiff satisfies Article III's standing requirements if it has "suffered an injury in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 395 (1982).[1] Defendants' extensive reliance on *FDA v. Alliance for Hippocratic Medicine* ("*AHM*") is misplaced—that case is wholly consistent with Plaintiffs' standing arguments. 602 U.S. 367, 394-95 (2024). The *AHM* Court held that an entity whose only activity is political advocacy cannot create standing simply by spending money to oppose the challenged policy. *Id.* However, the Court reaffirmed the longstanding principle that an organization has standing to sue if the challenged policy impacts its ability to provide one of its core services or activities. *Id.* Here, the Organizational Plaintiffs are service providers who plainly meet that standard.

In *AHM*, the Court reaffirmed that its opinion in *Havens* governs organizations' standing "to sue on their own behalf for injuries they have sustained." *AHM*, 602 U.S. at 393, 395. The Court reiterated that, when a challenged action has "directly affected and interfered with [the plaintiff organization's] core business activities" that is a cognizable injury for standing. *Id.* at 395 (citing *Havens*). In *Havens*, the Court held that an organization providing housing counseling services had standing to sue an apartment-complex owner who was providing Black individuals with false information about rental availability. 455 U.S. at 366-68, 378-79. The plaintiff organization ("HOME") alleged that "its efforts to assist equal access to housing through

---

[1] An organization can also assert standing "as the representative of its members." *Students for Fair Admissions*, 600 U.S. at 199 (citation omitted). Although Plaintiffs reserve the right to assert associational standing after appropriate discovery and the implementation of HB 1569, the Organizational Plaintiffs do not rely on associational standing at this time. Accordingly, the majority of Defendants' arguments related to these Plaintiffs are inapposite. *See* Defs.' Br. at 8-17. However, Plaintiffs concede neither Defendants' overstatement of the standards for associational standing nor their misrepresentation of allegations regarding Plaintiffs' organizational missions as nongermane to this lawsuit. *See id.* at 14-16.

counseling and other referral services" had been frustrated because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379; *see AHM*, 602 U.S. at 395 (finding it "[c]ritical[]" that "HOME not only was an issue-advocacy organization, but also operated a housing counseling service"). The Court concluded that, if the defendants' actions "have perceptibly impaired HOME's ability to provide counseling and referral services," then "there can be no question that the organization has suffered injury in fact," because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. That is, "Havens's actions directly affected and interfered with HOME's core business activities." *AHM*, 602 U.S. at 395.

The Court in *AHM* then applied the *Havens* standard but found that the *AHM* organizational plaintiffs fell short. Namely, they failed to allege that any defendant's action caused any "impediment" to their preexisting core services. *AHM*, 602 U.S. at 395. Instead, the *AHM* plaintiffs claimed only that they chose to expend resources "engaging in public advocacy and public education" to "oppose [the defendant's] actions." *AHM*, 602 U.S. at 394. Consistent with *Havens*, the Court held that an organization that has not otherwise suffered a concrete injury "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*[2] The key conclusion from *AHM* is that an

---

[2] *AHM* reaffirmed distinctions that the First Circuit already recognized. *See Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021) (recognizing that, under *Havens*, an organization has standing based on allegations that defendants' conduct "had 'perceptibly impaired' the organization's ability to provide [core] services, such that it 'has had to devote significant resources to identify and counteract' that conduct"); *id.* at 31 n.5 (citing cases in which "civil rights organizations had standing to challenge specific violations of voter registration requirements by state officials based on their allegations that they had diverted resources to help particular individuals affected by those violations").

organization may not establish standing to challenge a policy based on resources expended *to advocate in opposition to* that policy; but it can establish standing where the challenged policy has negatively impacted its core activities or caused it to divert funds from those activities.

The Organizational Plaintiffs here bear no similarity to the advocacy organization in *AHM*. The Organizational Plaintiffs are not mere issue-advocacy groups; their core services are the nuts and bolts of voter registration, poll operation, and voter education. Accordingly, the Organizational Plaintiffs fall squarely within the ambit of *Havens*. The Complaint alleges in *extensive* detail how HB 1569's elimination of the Qualified Voter Affidavit and Challenged Voter Affidavit directly burdens their core services.

To begin, Open Democracy alleges that HB 1569 will directly burden "a variety of [its] services that aim to assist prospective voters with exercising their voting rights"—particularly "young voters, new citizens, and low-income voters." Compl. ¶ 23. For example, as part of its voter assistance services for "eligible young people," Open Democracy "works with students to operate voter registration drives in approximately two dozen high schools across New Hampshire." *Id.* ¶¶ 24-25. Now, Open Democracy will be unable to carry out its mission as to a subset of young voters (those without required documentation) who, prior to HB 1569, could easily have registered. In the past, students' failure to bring documentary proof of citizenship "would not pose a barrier to Open Democracy's services" due to the Qualified Voter Affidavit. *Id.* But "[u]nder HB 1569's new regime, Open Democracy's core registration assistance services to young voters who lack immediate access to documentary proof of citizenship w[ill] be less effective." *Id.* This is no mere speculation; it has already happened. After HB 1569's passage, an election official "turned away students who lacked documentary proof of citizenship" from an Open Democracy registration drive. *Id.*

Open Democracy alleged specific ways in which it will "be forced to redirect and expend significant resources to address the law's effect on this core service." Compl. ¶ 26. Importantly, these are *not* allegations that Open Democracy will expend resources to "advocate against" HB 1569. *AHM*, 602 U.S. at 394. Rather, these are allegations that HB 1569 is an impediment to its work. *Id.* at 395. Open Democracy will be unable to provide certain core services to qualified voters who lack the requisite documentation, or will only be able to do so with significant additional cost and effort. This also means diverting resources from other aims. *See* Compl. ¶ 26 ("[M]itigating the harm of HB 1569 on the provision of these services would necessarily draw resources away from Open Democracy's work involving other organizational priorities, including its advocacy for campaign finance reforms and efforts to secure fair districting maps."); *id.* ¶ 30.

Open Democracy also alleges that HB 1569's repeal of the Challenged Voter Affidavit directly affects and interferes with its core service of "protecting qualified voters from unnecessary burdens on election day by recruiting and training poll observers." *Id.* ¶ 31. Open Democracy's regional teams' duties include "recruiting, training, and serving as poll workers and poll observers." *Id.* Open Democracy conducts training courses that "include instruction on how to assist voters whose eligibility is challenged at the polls, and [] include instruction on the Challenged Voter Affidavit." *Id.* "HB 1569 . . . make[s] it immeasurably harder for any number of poll observers to protect voters from disenfranchisement in the event of an eligibility challenge." *Id.* Accordingly, Open Democracy will not only need to "change these trainings and re-educate poll observers" due to HB 1569; it will also "need to field more observers for future elections in order continue providing services that protect qualified voters on election day." *Id.* (alleging need to expand from having "100 poll observers" in targeted locations to placing "a trained observer in every polling location in the state" in order to mitigate the effects of HB 1569, which will otherwise

result in certain qualified voters' inability to register). The Complaint clearly alleges that Open Democracy will need to "redirect[] time and resources away from other organizational priorities in order to recruit more volunteers," and shift volunteers who would "otherwise serve as poll *workers*" toward "training them to serve as poll *observers*." *Id.* (emphasis added).[3]

Thus, "there can be no question that [Open Democracy] has suffered injury in fact." *Havens*, 455 U.S. at 379. The challenged provisions of HB 1569 "have perceptibly impaired [Open Democracy's] ability to provide" voter registration assistance services, poll observing services, and other core activities. *Id.* "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

A single plaintiff with standing "is sufficient for the case to proceed," *Save Our Heritage*, 269 F.3d at 55. However, the remaining Organizational Plaintiffs satisfy *AHM* and *Havens* as well. The Complaint details how HB 1569 "directly affect[s] and interfere[s] with" LWV-NH's core services. Compl. ¶¶ 35-38. These core services include providing New Hampshire residents with unbiased, nonpartisan voter services and citizen education through materials and trained volunteers. *Id.* ¶ 35. For example, in the past, LWV-NH was routinely able to assist "individuals who do not possess or cannot find documentary proof of citizenship" by educating them about how to register to vote, but with HB 1569's elimination of the Qualified Voter Affidavit, LWV-NH is entirely "unable to assist such individuals." *Id.* ¶¶ 36-37. Moreover, "the ambiguities,

---

[3] HB 1569 also impacts Open Democracy's other programs, including direct constituent services, phone banking to aid with voter registration, and informational Zoom sessions in prisons. Compl. ¶¶ 21-32. The removal of the Qualified Voter Affidavit hinders Open Democracy's ability to serve "people who have lost critical documentation in home fires, unhoused individuals who lacked access to documentary proof of citizenship, citizens who had recently moved to a new town and could not access or locate the necessary documents, and more." *Id.* ¶ 29.

complexities, and broad discretion introduced by HB 1569 directly harm LWV-NH's ability to provide clear information on how to register to vote as part of its preexisting core voter education services." *Id.* ¶ 37. For instance, LWV-NH is now unable to advise the many New Hampshire women whose documents do not reflect their marital name. *Id.* LWV-NH will also need to create new materials and retrain its staff and volunteers due to HB 1569 and "refocus [its] outreach efforts" to reach populations most impacted by HB 1569 at the expense of other priorities. *Id.* ¶ 35. As with Open Democracy, LWV-NH is not diverting resources to "advocate against" HB 1569; rather, it has been forced to counteract HB 1569's impediment on its preexisting, core services. *Havens*, 455 U.S. at 379.

The Forward Foundation has also alleged an injury in fact. Its "core services" include "sophisticated nonpartisan voter education and outreach programs," which focus on "communities with lower voter engagement, including new U.S. citizens, communities of color, and working-age people who have recently moved to New Hampshire." Compl. ¶¶ 40-41. Prior to HB 1569, The Forward Foundation's services included "inform[ing] individuals that the state does not require a passport or birth certificate to prove citizenship so long as a Qualified Voter Affidavit is completed." *Id.* Much like the injuries to LWV-NH, HB 1569's confusing and restrictive requirements "harms The Forward Foundation's ability to provide effective assistance services to its key constituencies"—which "are among those most likely to be disenfranchised by HB 1569." *Id.* ¶¶ 42-44. Due to HB 1569, the Forward Foundation will need to "modify and recreate all of its educational materials" and public content "to reflect HB 1569's changes and to combat the confusion that it would cause" and redirect resources toward at-risk communities instead of the general public. *Id.*; *see Havens*, 455 U.S. at 379. The Forward Foundation's core "poll worker recruitment and training services" will also suffer. *Id.* ¶¶ 46-47. As with Open Democracy, HB

1569's elimination of the Challenged Voter Affidavit makes it "substantially harder" to recruit volunteers. *Id.* The Forward Foundation must also divert volunteers, who would otherwise be trained as poll workers, to serve as poll observers monitoring voter challenges. *Id.* ¶ 47.

As in *Havens*, the Organizational Plaintiffs here are far more than "issue-advocacy organization[s]." *AHM*, 602 U.S. at 395. Rather, each Organizational Plaintiff thoroughly alleges that it engages in preexisting core activities and services, that HB 1569 "perceptibly impaired [the organization's] ability to provide" those services, and that there has been a "consequent drain on the organization's resources" to "counteract" that impairment. *Havens*, 455 U.S. at 379. Plaintiffs cannot avoid this resource drain without abandoning their preexisting missions. HB 1569 "directly affected and interfered with [Plaintiffs'] core . . . activities," *AHM*, 602 U.S. at 395, and "there can be no question that [each] organization has suffered injury in fact." *Havens*, 455 U.S. at 379.

Indeed, post-*AHM*, numerous courts have held that civic groups providing voter registration services that are similar to the Organizational Plaintiffs—including another state's League of Women Voters—have standing to challenge voting-related burdens and restrictions. *E.g.*, *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024); *Get Loud Ark. v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754, at *14 (W.D. Ark. Sept. 9, 2024); *Caicedo v. DeSantis*, No. 6:23-CV-2303-JSS-RMN, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024); *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

Defendants' arguments to the contrary rely on misstatements of the allegations in an effort to shoehorn Plaintiffs into their reading of *AHM*. Defendants cherry-pick phrases from Plaintiffs' Complaint, claiming that each Organizational Plaintiff only "alleges that the net effect of HB 1569's changes to New Hampshire law will negatively impact their other advocacy activities," and

that accordingly, Plaintiffs complain of setbacks to "abstract social interests" and seek to "manufacture standing" by "expending money . . . to advocate against the defendant's action." Defs.' Br. at 18-20 (quoting *AHM*, 602 U.S. at 374-75). Defendants falsely suggest that "the 'only injury arises from the effect of [a challenged action] on the organizations' lobbying activities, or when the service impaired is pure issue-advocacy.'" *Id.* at 18-19 (quoting *Equal Means Equal*, 3 F.4th at 30). In doing so, they wholly ignore the extensive allegations of the Organizational Plaintiffs' missions, the core services they provide in pursuit of those missions, and the numerous ways in which HB 1569's provisions directly affect and interfere with those core services.[4]

Defendants do not dispute that the Organizational Plaintiffs meet the causation or redressability prongs of the standing analysis. *See* Defs.' Br. at 17-20 (arguing only that HB 1569 has not caused the Organizational Plaintiffs to suffer an injury in fact). Nor could they. Each of the injuries laid out in the Complaint is fairly traceable to the enactment of HB 1569—namely its removal of the Qualified Voter Affidavit and Challenged Voter Affidavit—and those injures would undoubtedly be redressed by a favorable ruling that eliminates the harmful effects of the law. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

**B. The Individual Plaintiffs have standing.**

The Individual Plaintiffs also have standing to bring this case. Courts have long recognized that any burden on the right to vote, even if slight, is sufficient to confer standing. *Gill v. Whitford*, 585 U.S. 48, 65-66 (2018); *see Gray v. Sanders*, 372 U.S. 368, 375 (1963) ("Any person whose right to vote is impaired has standing to sue."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) (holding that "[r]equiring a registered voter . . . to produce [certain]

---

[4] This is likely because Defendants' standing arguments are lifted nearly verbatim from a motion to dismiss in a separate challenge to HB 1569, with a different organizational plaintiff with distinct standing allegations and narrower claims. *See* Mot. to Dismiss at 12-15, *New Hampshire Youth Movement v. Scanlan*, 1:24-cv-291 (D.N.H., filed Dec. 20, 2024), ECF No. 24-1.

identification" to participate in the electoral process "is an injury sufficient for standing"). Indeed, "[a] plaintiff need not have the franchise wholly denied to suffer injury," rather "[a]ny concrete, particularized, non-hypothetical injury to a legally protected interest [in voting] is sufficient." *Billups*, 554 F.3d at 1351 (quoting *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)). The burden on a voter need not be "significant" to confer standing. *Id.* at 1351 (citing *United States v. Students Challenging Regul. Agency Procs. ("SCRAP")*, 412 U.S. 669, 689 n. 14 (1973)). And courts have repeatedly held that a requirement imposed on voters—including the requirement to present certain documentation—constitutes an injury-in-fact, even where plaintiffs' compliance with the law is theoretically possible. *See, e.g.*, *id.* at 1352 ("[T]he lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification.") (citation omitted); *Brakebill v. Jaeger*, 932 F.3d 671, 677 (8th Cir. 2019) ("[T]he burden of obtaining a qualifying identification or supplemental document . . . is sufficient to constitute an injury that gives a citizen standing to sue."); *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 966 (W.D. Wis. 2016) (holding that "individual voters who currently have IDs" still suffer "injuries [that] are sufficient to confer standing to challenge the voter ID law"); *see also Veasey v. Perry*, 29 F. Supp. 3d 896, 910 (S.D. Tex. 2014) ("Being able to overcome the injury [to the right to vote] does not eliminate it for standing purposes.").

Instead of addressing whether HB 1569 burdens the Individual Plaintiffs' interests, Defendants overlook this expansive body of case law on standing in voting rights cases and improperly ask the Court to consider whether the Individual Plaintiffs could potentially comply with HB 1569 despite those burdens, and whether the Individual Plaintiffs will ultimately be prevented from voting. Defs.' Br. at 23-26.

As detailed below, each Individual Plaintiff has demonstrated a stake in the outcome of this case in "asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Lyman v. Baker*, 954 F.3d 351, 362 (1st Cir. 2020) (quoting *Baker v. Carr*, 369 U.S. 186, 208 (1962)). Furthermore, the Individual Plaintiffs' injuries are directly traceable to HB 1569 and can be redressed by the injunctive relief sought in this case.

### 1. Each Individual Plaintiff has articulated injuries in-fact.

#### a. Plaintiff McKenzie Nykamp Taylor has suffered an injury-in fact.

Plaintiff McKenzie Taylor is presently registered to vote in New Hampshire under her maiden name, McKenzie St. Germain. Compl. ¶ 48. However, Ms. Taylor was married in 2024 and determined she "would change her surname." *Id.* [5] "She has not yet formally updated her U.S. passport, New Hampshire driver's license, or other identifying documents to reflect her desired surname change." *Id.* Ms. Taylor intends to move within New Hampshire, and as such would need to re-register.

Although HB 1569 should not, by its terms, apply to those already registered in New Hampshire who are transferring their registration to a different municipality within the state, *see* RSA 654:12, III, in practice, the law is just as likely—and perhaps even more likely—to burden citizens like Ms. Taylor. For a polling place to confirm a voter's prior registration, the election day workers must access the state's voter registration database. But the availability of this voter registration database at polling places on election day is highly limited at best, and as a result, substantial numbers of voters re-registering in a different municipality are required to re-prove their citizenship. *Id.* ¶¶ 83-84. Indeed, Defendants' professed ignorance about the frequency with

---

[5] Since filing the Complaint, Ms. Taylor has applied to change her last name with the Social Security Administration but has not yet applied to update her identifying documents.

which individuals in Ms. Taylor's circumstance will be forced to produce documentary proof of citizenship is belied by Secretary Scanlan's own formal guidance about implementing HB 1569. *Compare* Mot. to Dismiss at 22-23, 27-28, *with* Ex. A at 10 ("HB 1569 – Frequently Asked Questions").[6] Secretary Scanlan identified a question that has been "*frequently* asked" by New Hampshire clerks and registrars who "*often* have difficulty with wireless connectivity" at polling places and want to know "what we should do" because "[w]ithout having access to [the Statewide Voter Registration System] we may be unable to establish whether someone was previously registered in New Hampshire, and therefore not required to prove citizenship." Ex. A at 10 (emphasis added). In response, the Defendant formally instructed all election officials in the state that "the voter will need to provide you with proof of citizenship," regardless of whether they in fact were previously registered. *Id.*

Uncertainty regarding the enforcement of HB 1569's documentation requirements and Ms. Taylor's need to register her new surname and a new location when she moves are likely burdens that demonstrate an injury-in-fact. *Veasey*, 29 F. Supp. 3d at 911 ("[A]n identifiable trifle is enough for standing to fight out a question of principle."); *cf. One Wis. Inst., Inc.*, 186 F. Supp. 3d at 966 ("IDs expire, meaning that the individual voters who currently have IDs will eventually have to renew them or acquire new forms of acceptable identification. These injuries are sufficient to confer standing to challenge the voter ID law.").

In addition, Ms. Taylor is at risk of being subjected to ad hoc decisions regarding her voting rights. In *Veasey*, the court found that plaintiffs had standing to challenge a photo ID law that gave

---

[6] Courts may take judicial notice of "documents the authenticity of which are not disputed by the parties" and "official records." *Parker v. Hurley*, 514 F.3d 87, 91 n.1 (1st Cir. 2008) (citation omitted) (taking judicial notice at the pleadings stage of "statewide . . . standards" document issued by state agency).

election officials unfettered authority to determine whether a name on the voter roll was sufficiently "substantially similar" to the name on an ID in the event they did not match. 29 F. Supp. 3d at 910. The court concluded that "even if [the plaintiffs'] registered names and the names on their photo identification cards are 'substantially similar,' the fact that they will be subject to an election officer making an ad hoc decision and [will then be required] to sign an affidavit of identity is sufficient to confer standing." *Id.* at 911. Similarly, Ms. Taylor asserts that House Bill 1569's "any other reasonable documentation" standard for proving United States citizenship is unclear, particularly given the discrepancy between her maiden and marital names on her documentation. Compl. ¶¶ 74-89. The acceptance of such documentation is subject to the arbitrary discretion of election officials, which is injury enough. *Id.* ¶ 89.

### b. Plaintiff December Rust has suffered an injury-in-fact.

Similar to Ms. Taylor, Plaintiff December Rust sufficiently alleges that HB 1569's removal of the Qualified Voter Affidavit imposes a burden on his right to vote. Based on his status as an unhoused individual, he intends to move within the state in the future. As a result of that move, he is likely to be required to furnish documentary proof of citizenship to re-register to vote. Compl. ¶ 49. The attendant uncertainty around the applicability of HB 1569's documentation requirements to Mr. Rust when he re-registers to vote, including the vague standard of "any other reasonable documentation" required to prove citizenship, places Mr. Rust in a position where he must secure new forms of identification or supplemental documents. This constitutes an injury-in-fact. *Id.* ¶¶ 73-75; *see Veasey*, 29 F. Supp. 3d at 911.

There is no meaningful dispute that that HB 1569's requirements are highly likely to force Mr. Rust to spend time and resources to obtain the necessary documentation to ensure he is able to exercise his right to vote. *See* Compl. ¶¶ 80-82. Defendants fall wide of the mark with suggestions that Mr. Rust's harm is insufficient because he—despite lacking access to stable

housing—could theoretically travel over a hundred miles to another state to pay for a birth certificate, or because a clerk might hypothetically confirm his citizenship based on "alternative citizenship documentation" that Mr. Rust does not claim to possess. Defs.' Br. at 27-28. Courts have held that the burden of obtaining qualifying records constitutes an injury-in-fact, regardless of the plaintiff's ability to comply. *See Billups*, 554 F.3d at 1350-52 (finding standing where the plaintiffs were "required to obtain photo identification before they can vote, and the imposition of that burden is an injury sufficient to confer standing regardless of whether [the plaintiffs] are able to obtain photo identification."); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1132 (N.D. Ala. 2020) (finding injury-in-fact where plaintiff "must obtain a copy of her ID before she can vote absentee."). The burdens on Mr. Rust constitute an injury-in-fact.

Mr. Rust also alleged an injury resulting from HB 1569's removal of the Challenged Voter Affidavit. Mr. Rust is substantially more susceptible to a voter challenge being deemed "well grounded" due to his lack of a physical address as an unhoused individual and identification reflecting his current residence or his citizenship. Compl. ¶ 50. Without the availability of a Challenged Voter Affidavit, Mr. Rust is highly likely to face outright denial of his right to vote unless he is able to navigate substantial additional hurdles, such as needing to seek an emergency court order declaring him eligible to vote, at great personal expense. *Id.*

### c. Plaintiffs Miles Borne, Alexander Muirhead, and Lila Muirhead have suffered injuries-in fact.

Plaintiffs Miles Borne, Alexander Muirhead, and Lila Muirhead allege HB 1569 burdens them by requiring them to recover and present qualifying birth certificates or passports in order to register to vote once they turn eighteen. That burden confers standing.

Defendants' argument that these Plaintiffs are not injured for standing purposes because they may ultimately be able to comply with the requirements of HB 1569 is not supported by law.

As explained, an injury for standing purposes does not need to allege that a plaintiff *will* be disenfranchised under the challenged law, but rather that the law imposes a burden on the exercise of their right to vote. *See Billups*, 554 F.3d at 1351. The severity of the burden has no bearing on standing. *Id.*; *Brakebill*, 932 F.3d at 677 ("The severity of the burden is a question relating to the merits, not to [plaintiff's] standing to bring this action."). HB 1569 forces Plaintiffs Borne, Muirhead, and Muirhead to present documentation to register to vote—that alone confers standing. *Billups*, 554 F.3d at 1351–52.

### 2. The Individual Plaintiffs satisfy the causation and redressability requirements for standing.

The Individual Plaintiffs also satisfy the requirements of redressability and causation. The causation element is met because their alleged injuries—the burden of obtaining and presenting proper documentation to register to vote and have their vote counted—directly result from implementation of HB 1569. *See* Compl. ¶¶ 92-122; *see Gill*, 585 U.S. at 65-66 ("'[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage."). Those injuries would be redressed by a favorable decision invalidating or enjoining HB 1569's enforcement. Such an order would restore the Qualified Voter Affidavit, which would obviate the need to obtain documents proving their eligibility, and the Challenged Voter Affidavit, which would prevent erroneous disenfranchisement due to a voter challenge.

## II. Dismissal Under Rule 12(b)(6) is Improper.

### A. Counts I and II plausibly state claims of unconstitutional burdens on the right to vote.

Under the *Anderson-Burdick* framework, which Defendants agree govern Counts I and II, Defs.' Br. at 30, courts "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). "However slight the

burden [to the right to vote] may appear . . . it must be justified by relevant and legitimate state interests sufficiently weight to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (cleaned up).

Plaintiffs allege significant burdens on the right to vote. HB 1569 reshapes longstanding New Hampshire law, eliminating the ability of voters to register to vote through use of a Qualified Voter Affidavit if they do not have documents on hand to establish citizenship. Compl. ¶¶ 6-7. HB 1569 now requires voters to provide either a birth certificate, a passport, or naturalization papers.[7] Many New Hampshire residents currently lack documentary proof of citizenship, *id.* ¶¶ 9, 75-76, and obtaining these documents is typically time-consuming and expensive, particularly for foreign-born U.S. citizens or elderly citizens who cannot rely on a birth certificate.[8] *Id.* ¶ 78-82. The application and execution fees for a new passport book can cost $165, and the wait time can be up to 10 to 12 weeks, with expedited orders incurring an additional fee of $60. *Id.* ¶ 78. For naturalization papers, the filing fee is over $500 and the processing time was recently around eight-and-a-half months. *Id.* ¶ 80. Due to that time and expense, those without these documents who attempt to register close to or on election day will likely lose access to same-day registration; voters who unexpectedly must re-register at the polls after being purged from the voter rolls may also be disenfranchised. *Id.* ¶¶ 8, 81. Ten percent of the entire electorate registered on Election Day in November 2020. *Id.* ¶ 61. HB 1569 therefore burdens the right to vote by removing the

---

[7] Defendants suggest that HB 1569's acceptance of "other reasonable documentation" of citizenship means that there is no burden on would-be voters. *See* Defs.' Br. at 36. But despite their extensive briefing, Defendants have provided no further clarity as to what "reasonable documentation" entails. That ambiguity risks arbitrary and disparate enforcement.

[8] Even birth certificates are burdensome to obtain, particularly for those born outside of New Hampshire or even abroad. *See* Compl. ¶ 79.

Qualified Voter Affidavit, making it more difficult (and potentially impossible) for qualified voters, such as the Individual Plaintiffs,[9] to register and to exercise their right to vote.

The elimination of the Challenged Voter Affidavit imposes severe burdens as well. HB 1569 strips registered voters of the right to vote based on challenges from political actors or other voters—who are not themselves required to provide any evidence beyond an affidavit. Compl. ¶¶ 87-89, 102. Challenged voters must scramble, with no notice, to prove that the challenge is not "more likely than not" to be "well grounded," to the satisfaction of each election moderator's subjective interpretation, or else lose the ability to vote. *Id.* The "well grounded" standard is not defined. This ambiguity makes preparing for a voter challenge particularly burdensome and exposes voters to arbitrary and disparate standards depending on where they vote and who the moderator happens to be. *Id.* Further, the only remedy provided by HB 1569 requires a would-be voter to obtain *immediate* review of the challenge decision in the superior court. Neither the statute nor Defendants account for the practical barriers and costs associated with seeking such review, including the retention of an attorney; the same-day drafting of a complaint and motion for emergency injunctive relief with no prior notice; the payment of court fees; and the fact that the superior court closes *before* the polls on election day. *Id.* ¶ 88. These allegations sufficiently allege that HB 1569's removal of the Challenged Voter Affidavit burdens the right to vote.[10]

---

[9] Defendants assert that the Complaint concedes that HB 1569 does not apply to Plaintiffs Taylor and Rust, but the Complaint makes no such concession. While HB 1569's documentary proof of citizenship requirement *should not* apply to those already registered in New Hampshire who are relocating within the state, Plaintiffs allege that, in practice, HB 1569 is likely to disenfranchise such voters. *See* Defs.' Br. at 36; Compl. ¶ 83. The Complaint also plainly states HB 1569's burdens on Ms. Taylor and Mr. Rust. Compl. ¶¶ 48-49.

[10] Defendants repeatedly cite *Alston v. Spiegel*. 988 F.3d 564 (1st Cir. 2021) to suggest the Court should not credit the Complaint's allegations. However, *Alston* held that allegations are only insufficient where they are "too meager, vague, or conclusory to remove the possibility of relief

Moreover, dismissal of *Anderson-Burdick* claims, which are fact-intensive, is generally inappropriate at the motion to dismiss stage. *E.g.*, *Cruz v. Melecio*, 204 F.3d 14, 22 (1st Cir. 2000) ("The fact-specific nature of the relevant inquiry, *see, e.g.*, *Anderson*, 460 U.S. at 789-90 (warning that this type of inquiry is never 'automatic'), obviates a resolution of this case on the basis of the complaint alone.").[11] The Court should deny Defendants' motion to dismiss Counts I and II.

## B. Count III adequately states a claim that HB 1569 violates Procedural Due Process.

Plaintiffs more than adequately state a claim that the elimination of the Challenged Voter Affidavit violates Procedural Due Process. When considering what process is due, courts balance three factors: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Collins v. Univ. of N.H.*, 664 F.3d 8, 17 (1st Cir. 2011) (cleaned up).

First, the right to vote is a fundamental constitutional right, and there can hardly be a weightier private interest. *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966); *Igartua v. United States*, 654 F.3d 99, 102 (1st Cir. 2011) ("The fundamental constitutional right at stake is the right to vote, a right which has been poignantly described as 'preservative of [all] other basic civil and political rights [and whose] alleged infringement . . . *must be carefully and meticulously scrutinized*.'" (citation omitted)). This Court has held that imposing a signature

---

from the realm of mere conjecture." *Id.* at 571 (citation omitted). In contrast to the plaintiff in *Alston*, who failed to allege key elements of their claims, the Complaint here plainly and plausibly alleges *multiple* ways in which HB 1569 burdens the right to vote.

[11] *See also Mi Familia Vota v. Fontes*, No. 2:22-cv-00509-PHX-SRB, 2023 WL 8183070, at *14 (D. Ariz. Feb. 16, 2023) ("[B]ecause *Anderson-Burdick* claims are particularly fact-sensitive, dismissal under Rule 12(b)(6) is disfavored."); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1278 (N.D. Ga. 2021) (declining fact-intensive balancing at motion to dismiss stage); *Libertarian Party of N.H. v. Gardner*, No. 14-cv-00322-PB, 2014 U.S. Dist. LEXIS 178195, at *10 (D.N.H. Dec. 30, 2014) (same in ballot access context).

requirement on voters triggered the protections of Procedural Due Process, and the same is true of HB 1569's restrictions. *See Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018).

Second, Plaintiffs have plausibly asserted that erroneous disenfranchisement is likely to occur due to the elimination of the Challenged Voter Affidavit. Because registered voters will have no prior notice of an election-day challenge, there is almost no chance that they will happen to have proof rebutting the challenge on their person, or witnesses to testify in support of their qualifications present. *Id.* ¶¶ 87-89. HB 1569 also lacks standards for moderators to determine whether a challenge is "more likely than not" to be "well grounded," which confers immense discretion on moderators hearing the challenge and provides little guidance to voters. *See id.* ¶ 87; *Saucedo*, 335 F. Supp. 3d at 217-18 (finding due process violation in part because "neither state law nor any guidance from state agencies sets forth functional standards for comparing signatures and assessing variations"). If a challenge is upheld under that amorphous process, the voter *will* be prevented from casting a ballot—even a provisional one. Compl. ¶¶ 87-89, 102.

To make matters worse, HB 1569 only provides one avenue for appealing a moderator's decision: a largely illusory judicial review process. *See id.* ¶ 88; *Saucedo*, 335 F. Supp. 3d at 218 ("The absence of functional standards is problematic, and the likelihood of error resulting therefrom is only compounded by the lack of meaningful review or oversight."). Because a voter cannot cast a ballot at all if the moderator upholds the challenge, the superior court review would need to be adjudicated within hours, in time to allow the voter to return to the polling place and cast a ballot. Such litigation is highly unlikely to be initiated and completed in time, making this hypothetical "safeguard" ineffective and impractical. *See id.* ¶ 88. The costs and hurdles of filing a claim in superior court will also deter many voters who might otherwise try to challenge a moderator's decision. *See* Compl. ¶ 113. The Challenged Voter Affidavit, by contrast, avoids all

of the procedural defects created by HB 1569—there is no vague, discretionary standard, nor is there any burden on voters to improbably obtain emergency judicial review at personal cost.

Defendants do not dispute that the process to file a claim can be complicated and expensive but merely assert that "[t]he superior court's duty on appeal is mandatory, immediate, and comprehensive." Defs.' Br. at 33. Defendants then go beyond "the four corners" of the Complaint, to cite an inapposite news article which reported that courts have ordered *polling places* to stay open one hour later. *See Young v. Lepone*, 305 F.3d 1, 10-11 (1st Cir. 2002). Even if this Court could take notice of that fact (and it should not), that does not indicate that the superior court would be able to conduct a same-day review of every voter challenge, which may occur *en masse*, or that the *courts themselves* (rather than the polls), would stay open late to allow for filing and hearings on challenges that occur late in the day. Regardless, Defendants' fact-based arguments demonstrate why the Court should decline to dismiss Count III for failure to state a claim.

Finally, the use of the Challenged Voter Affidavit serves the government's interest, "which may include 'the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Saucedo*, 335 F. Supp. 3d at 220. Election officials have successfully administered the Challenged Voter Affidavit for years prior to HB 1569—there is accordingly minimal administrative burden to rely on that familiar process, as opposed to implementing HB 1569's novel and ambiguous terms. *See id.* at 221 ("Consequently, this is a case not of foisting wholly novel procedures on state election officials."); Compl. ¶¶ 58-60. To the extent that HB 1569 was intended to further election integrity or voter confidence, there is no question that voter fraud was exceedingly rare prior to HB 1569's enactment. Compl. ¶¶ 62-64, 90-91. Given the risk that voters may be ambushed by challenges at the polls and ultimately disenfranchised under its deficient procedures, HB 1569 is likely to prevent more eligible voters

from voting than the cases of fraud it deters—which *undermines* election integrity and confidence. *See id.* at 220 ("[I]n comparison to the two instances of absentee-voter fraud that defendants cite as support, one in the 2012 General Election and the other in the 2016 General Election, hundreds of voters (approximately 740 by plaintiffs' estimate) were disenfranchised.").

### C. Count IV adequately states a claim for denial of Equal Protection.

Plaintiffs have more than adequately pleaded that the removal of the Challenged Voter Affidavits violates Equal Protection. The Supreme Court has long held that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Rather than create a uniform standard for all New Hampshire voters, HB 1569 enables arbitrary treatment that varies by polling location. *Id.* ¶ 121. Election moderators are empowered to individually and subjectively determine what it means for a challenge to "more likely than not" be "well grounded" or what amounts to "other reasonable documentation" of citizenship for registration purposes, creating the prospect that documentary requirements are more stringent in some localities than others. *Id.* The same document may well be accepted (or stave off a voter challenge) in Concord but rejected in Laconia. Without more definition—or, indeed, any standards at all—these determinations by various moderators in the midst of election day will undoubtedly differ across New Hampshire's 320 voting jurisdictions.[12] *Id.* Defendants cannot offer any justification for such arbitrary distinctions.

Defendants, however, attempt to elide the applicable legal standard. They assert that "[a] disparate treatment claim requires a plausible allegation that . . . [defendants acted] with the intent to injure, inhibit, or punish the exercise of Plaintiffs' constitutional rights." *See* Defs.' Br. at 34. This is plainly not the standard. Indeed, the case Defendants cite, *Engquist v. Or. Dep't of Agr.*,

---

[12] N.H. Sec'y of State, *2024 State Primary Election* (Sept. 10, 2024), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/inline-documents/sonh/2024-state-primary-media-guide.pdf.

553 U.S. 591, 598 (2008) involves a "class-of-one" equal protection claim, which is not remotely applicable here. Rather, to assess whether Plaintiffs have stated an equal protection violation like Count IV, courts ask whether "non-uniform standards, processes, and rules" for elections will result in "the defendants arbitrarily deny[ing]" residents "the right to vote depending on where they live" and vote. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (rejecting the argument that the complaint must be dismissed because "that the equal protection claim requires a showing of 'intentional and purposeful discrimination'"). As described herein, the Complaint sufficiently alleges that, due to the lack of uniform standards for moderators hearing challenges, HB 1569 creates a likelihood that similarly situated voters from different municipalities, and even within municipalities, will be treated differently. *See Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional," "[e]ven without a suspect classification or invidious discrimination.") (citing *Bush v. Gore,* 531 U.S. 98, 121 (2000)). The supposed availability of judicial review does not negate the arbitrary nature of the law, as some voters would still arbitrarily face the high burden of filing emergency litigation in order to vote (described above), while a similarly situated voter whose challenge was heard by a different moderator would not. As such, the Court should decline to dismiss Count IV.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that the motion be denied in its entirety. If the Court deems dismissal appropriate for any claim, Plaintiffs respectfully request an opportunity to amend the complaint.

Respectfully submitted on this February 21, 2025,

COALITION FOR OPEN DEMOCRACY, LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE, THE FORWARD FOUNDATION, MCKENZIE NYKAMP TAYLOR, DECEMBER RUST, MILES BORNE, BY HIS NEXT FRIEND STEVEN BORNE, ALEXANDER MUIRHEAD, BY HIS NEXT FRIEND RUSSELL MUIRHEAD, AND LILA MUIRHEAD, BY HER NEXT FRIEND RUSSELL MUIRHEAD

By and through their attorneys,

*/s/ Henry R. Klementowicz*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE FOUNDATION
18 Low Avenue
Concord, NH 03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org

Jacob van Leer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
(202) 715-0815
jvanleer@aclu.org

Ming Cheung
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2500
mcheung@aclu.org
slakin@aclu.org

Geoffrey M. Atkins
John T. Montgomery
Desiree M. Pelletier
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street

Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com
Desiree.Pelletier@ropesgray.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2025, a copy of the foregoing document was served upon counsel for Plaintiff via electronic mail.

*/s/ Henry R. Klemetowicz*
*Henry R. Klementowicz*
