## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| COALITION FOR OPEN DEMOCRACY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, <br><br> *Defendant*. | Case No. 1:24-cv-00312-SE-TSM |

## AMICUS BRIEF OF REPUBLICAN PARTY
## IN SUPPORT OF MOTION TO DISMISS

The Republican National Committee and the New Hampshire Republican State Committee file this amicus brief in support of the State's motion to dismiss. *See* Doc. 36. While the State focuses its arguments primarily on Plaintiffs' standing, Amici address the merits of Plaintiffs' complaint. The Court granted Amici leave to file this brief no later than March 21, 2025. *See* Doc. 52. The brief is timely and complies with the Court's March 13 order.

## INTRODUCTION

Every State must balance ease of registration with the security and efficiency of administering elections. Some States strike that balance by cutting off registration days or weeks in advance of the election. That extra time permits their election officials to review applications, catch errors, and prepare for the election.

New Hampshire has chosen a different course. New Hampshire makes it easy to register and vote close to an election. New Hampshire residents can register to vote year round. And unlike most States, New Hampshire provides its residents the option to register on election day at their polling place. But this extra time for residents to register comes with potential tradeoffs in election security and efficiency.

HB 1569 addresses those tradeoffs. The law tightens a loophole by requiring firmer evidence of U.S. citizenship. New Hampshire voters have always been required to satisfy the basic requirement of citizenship. But under prior law, an applicant could simply submit an affidavit saying that they were a citizen. Documentary proof was not required. Relying on an applicant's word raises obvious concerns ranging from simple mistakes to outright fraud. The legislature addressed that concern by requiring applicants to provide documentary proof of citizenship in the form of a birth certificate or passport, for example. N.H. Rev. Stat. 654:12. By Plaintiffs' own admission, most applicants already have those documents readily available. *See* Compl. ¶76.

HB 1569 also adjusts the process for challenging voters who may be registered but not qualified to vote. Challenges must be submitted "in the form of a signed affidavit, under oath administered by an election official." N.H. Rev. Stat. §659:27-a. The process requires detailed information about the challenger, the voter whose qualifications are challenged, and the basis for the challenge. "Before ruling on the challenge, the moderator shall give the challenged voter an opportunity to be heard." *Id.* §659:27-a(II)(b). And anyone "aggrieved by the moderator's decision on a voter challenge may obtain immediate review of the decision in the superior court." *Id.* Previously, a challenged voter could still vote by filing an affidavit. HB 1569 provides an extra layer of protection *before* a vote is cast, providing that if "the moderator determines that it is more likely than not that the challenge is well grounded, the moderator shall not receive the vote of the person so challenged." *Id.* §659:27(II).

Plaintiffs argue that by eliminating these two affidavits, HB 1569 infringes on the right to vote. But eliminating limited accommodations for certain voters does not

"strip eligible voters of their constitutional right to vote." Compl. (Doc. 1) ¶96. Every resident still has plenty of opportunity to register and vote. Plaintiffs "imagine" various hypothetical situations that might cause some challenges. Compl. ¶77. But speculation that some voters might lose documents, or change their name, or have tough travel schedules, or any number of related incidents does not mean that HB 1569 unconstitutionally burdens the right to vote. Besides being speculative, each of those difficulties comes from life, not from New Hampshire's law. The Court should dismiss Plaintiffs' undue-burden claims for three reasons.

*First*, removing limited accommodations does not unconstitutionally burden the right to vote. To start, Plaintiffs haven't identified a cognizable burden on the right to vote. The Constitution doesn't require New Hampshire to accommodate voters by allowing them to prove their qualifications via affidavits in lieu of evidence. And the evidence isn't burdensome; most voters have the documents at the ready. If they don't, they can get them quickly and easily. And the ease of this system must be evaluated as a whole. It's easy to "imagine" hypothetical situations where registration could be easier, as Plaintiffs do. Compl. ¶77. But when viewed in its totality, New Hampshire's registration system is easy and accessible. It does not deny—or even impair—the right of any eligible person to vote.

*Second*, Plaintiffs rely on idiosyncratic burdens, particularly for voters trying to register on election day. But election-day registration is a privilege, not a right. Most States don't offer it at all. Nor does the Constitution require it. "[A] person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680 (1973). So Plaintiffs can't sustain their constitutional claims by arguing that HB 1569 burdens election-day

3

registration. Each of those voters still has the "right to vote." Relatedly, under binding precedent, Plaintiffs can't rely on the idiosyncratic burdens faced by only some voters. Precedent requires evaluating the burdens on voters generally, not on specific subgroups in unique circumstances.

**Third**, HB 1569 is supported by compelling state interests. At a minimum, those interests include conducting orderly elections, enhancing public confidence in election integrity, and guarding against voter fraud. These interests "obviously are compelling" as a matter of law. *Burson v. Freeman*, 504 U.S. 191, 199 (1992). The State is not required to present record evidence of its interests, which makes judgment against Plaintiffs appropriate at the pleading stage.

**Finally**, the Court should dismiss Plaintiffs due-process and equal-protection claims as duplicative of their other Fourteenth Amendment claims. The First Circuit has held that Fourteenth Amendment challenges to election laws are all evaluated under the same standard. *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 8, 14 (1st Cir. 2011). So these claims should be dismissed for the same reasons that Plaintiffs' undue-burden claims fail.

## INTERESTS OF AMICI

The Republican National Committee is a national committee under 52 U.S.C. §30101. It manages the Republican Party's business, coordinates election strategy, and supports Republican candidates nationwide. The New Hampshire Republican State Committee is a recognized political party that works to promote Republican values and assist Republican candidates in federal, state, and local races in New Hampshire. The RNC and the NHGOP have extensive expertise in election law,

election administration, and voting rights. And their members, candidates, and voters are among those most affected by lawsuits challenging election rules.

## ARGUMENT

### I. Removing limited accommodations does not unconstitutionally burden the right to vote.

According to Plaintiffs, once a State accommodates voters, it can't remove that accommodation without burdening the right to vote. But "imposing such a one-way ratchet is incompatible with the 'flexible' *Anderson-Burdick* framework." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). The *Anderson-Burdick* test requires the court to "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Only laws that impose "severe" burdens must be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But as is most often the case, election rules that are "reasonable, nondiscriminatory restrictions" and impose minimal burdens are readily justified by "the State's important regulatory interests." *Anderson*, 460 U.S. at 788.

Plaintiffs fail to state an *Anderson-Burdick* claim for at least three reasons: they haven't identified any burdens on the right to vote; they rely on idiosyncratic burdens on voters who wait until election day to register; and any alleged burdens are outweighed by the State's compelling interests in election integrity and security.

### A. Plaintiffs have not identified any burden on the right to vote.

New Hampshire has always required residents to establish that they are U.S. citizens when registering to vote. Plaintiffs don't challenge that requirement. And

they acknowledge that documentary proof of citizenship for registration is part of "longstanding New Hampshire law." Compl. ¶6. What Plaintiffs really challenge is HB 1569's elimination of "the option of registering to vote via a Qualified Voter Affidavit or Domicile Affidavit." Compl. ¶6. Each of their claims for relief targets only the feature of the law "Eliminating the Qualified Voter Affidavit for Citizenship" or "Eliminating the Challenged Voter Affidavit." Compl. pp.35-40. But Plaintiffs are unclear whether they seek a remedy reinstating those affidavits, or a remedy eliminating documentary proof entirely.

Plaintiffs' confusion is the result of a false assumption at the heart of their claims. Accommodations such as the voter affidavits are options that States can employ—or not. The Constitution doesn't require those accommodations, so removing them doesn't violate the Constitution. *See Ohio Democratic Party*, 834 F.3d at 635 ("[S]tates would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote."). Because there's no constitutional right to a qualified-voter affidavit for citizenship, or to a challenged-voter affidavit, New Hampshire is free to condition or eliminate these "measure[s] of grace." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021).

Even if this Court were to evaluate the burden of documentary proof of citizenship on its own, HB 1569 provides numerous options that are available to all citizens. To prove citizenship, applicants can present their "birth certificate, passport, naturalization papers if the applicant is a naturalized citizen, or any other reasonable documentation which indicates the applicant is a United States citizen." N.H. Rev. Stat. §654:12(I)(a). Plaintiffs acknowledge that most applicants have these

documents available without needing to take any extra steps. *See* Compl. ¶76. According to Plaintiffs, nearly 60% of the "eligible citizen, voting-age population" have passports. Compl. ¶76. And because obtaining a passport requires showing proof of citizenship,[1] that number almost certainly undercounts the number of eligible voters with birth certificates. The best statistic Plaintiffs can muster comes from a survey sponsored by groups opposed to proof-of-citizenship requirements. *See* Compl. ¶76.[2]  Even taking the number as true, only "21.3 million voting age citizens nationwide lack access to any proof of citizenship." Compl. ¶76. But Plaintiffs don't—or can't—identify how many of those voters reside in New Hampshire; how many are attempting to register to vote; or how many would be unable to access citizenship documents if they tried. Plaintiffs' own allegations demonstrate that whatever inconveniences proof of citizenship imposes, they fall on a vanishingly small group of potential applicants.

Even within this small population, the "costs and time" required to obtain proof of citizenship are minimal. *Contra* Compl. ¶79. As for costs, Plaintiffs admit that "a birth certificate for a person born in New Hampshire costs $15." Compl. ¶79. They point out that Michigan—no doubt the most expensive State their research turned up—costs $34. But the Supreme Court noted in 2008 that a fee "between $3 and $12" to obtain "the required documents" for voter identification "surely does not qualify as a substantial burden on the right to vote." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 & n.17 (2008) (plurality op.). Plaintiffs imply that the costs are prohibitive, but the best they can muster is an allegation that "on information and

---

[1] *See Citizenship Evidence*, U.S. Dep't of State, https://perma.cc/JD8L-T34Y.
[2] *Citing 21.3 Million American Citizens of Voting Age Don't Have Ready Access to Citizenship Documents*, Brennan Ctr. For J. (June 11, 2024), perma.cc/DW6T-NNUT.

belief, citizens routinely opt to sign the Qualified Voter Affidavit to register to vote in lieu of presenting citizenship documentation." Compl. ¶75. Even if true, that some voters prefer to submit an affidavit doesn't mean that those voters lack documentary proof or that providing it is a "severe" burden. It shows, at most, a preference of some indeterminate number of voters. Plaintiffs' alleged costs are far from prohibitive, let alone a "significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality op.).

As for time, New Hampshire voters have an abundance of it. They can register year round, on or before election day. The Supreme Court upheld Georgia's fifty-day registration cutoff as constitutional. *See Burns v. Fortson*, 410 U.S. 686, 686 (1973) (per curiam). It endorsed Arizona's similar fifty-day deadline. *Marston v. Lewis*, 410 U.S. 679, 680 (1973). And it upheld New York's thirty-day deadline to enroll in closed primaries. *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973). New Hampshire doesn't truly have a registration deadline; the cutoff is the election itself. Every resident has plenty of time to vote, and "a voter's interest in deciding late rather than early whether to participate in an election is not a weighty interest." *ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 149 (D. Conn. 2005). That some voters might experience unforeseen difficulties "on the way to the polls" is a problem "arising from life's vagaries," not a problem with HB 1569. *Crawford*, 553 U.S. at 197 (plurality op.). To the extent an applicant fails to register by election day, it is only because they "chose to disregard" their opportunity to register throughout the rest of the year. *Rosario*, 410 U.S. at 762.

In addition to being "reasonable," HB 1569 is also "nondiscriminatory." *Anderson*, 460 U.S. at 788. Plaintiffs perpetuate the trope that "persons of color

disproportionately lack access to the documentary proof of citizenship." Compl. ¶76. But they don't allege that HB 1569 violates any law that prohibits discrimination based on race. Presumably, Plaintiffs include these race allegations in an attempt to get around the rule that "[r]easonable, nondiscriminatory restrictions … need be justified only by legitimate regulatory interests." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010). At most, Plaintiffs' allegations indicate disparate impact. The *Anderson-Burdick* test, however, considers whether "[t]he law is *facially* neutral and nondiscriminatory." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (emphasis added). So where plaintiffs offer only "evidence of some differences in treatment," but "no evidence of discriminatory intent," the law cannot be labeled discriminatory. *Harlan v. Scholz*, 866 F.3d 754, 761 (7th Cir. 2017). And when "[a]ll parties are subject to the same requirements," as is true here, no party "faces a disproportionate burden." *Libertarian Party of Va.*, 826 F.3d at 717. HB 1569 "draws no classifications, let alone discriminatory ones." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment). Because Plaintiffs don't allege that the law is "discriminatory" under the *Anderson-Burdick* standard, HB 1569 must be "justified only by legitimate regulatory interests." *Barr*, 626 F.3d at 109.

The Complaint thus demonstrates that New Hampshire's registration system does not impose undue burdens on the right to vote. Plaintiffs can't satisfy Rule 8 with conclusory statements that HB 1569 burdens voters, or that the burden is "severe." Compl. ¶75. That's because the "characterization of the resultant burden … is not a factual finding, but a legal determination subject to *de novo* review." *Ohio Democratic Party*, 834 F.3d at 628. Courts "have not shied away from disposing of *Anderson-Burdick* claims at the motion-to-dismiss stage where a plaintiff's

allegations 'failed as a matter of law.'" *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021) (collecting cases). "Where … the alleged severity of the burdens imposed can be gleaned from the face of the challenged law and they can be weighed against the asserted state interests, dismissal on the pleadings is warranted." *Id.*; *see also Libertarian Party of Va.*, 826 F.3d at 719 (affirming dismissal of *Anderson-Burdick* claim, noting "we have no need to conduct the kind of empirical analysis into burdens that would essentially displace the authority of state legislatures with the views of expert witnesses").

However great the difficulties of obtaining proof of citizenship might be, they are a far cry from the "heavy burden[s]" the First Circuit has recognized under the *Anderson-Burdick* test. *See Common Cause R.I.*, 970 F.3d at 15 (discussing the "heavy burden" of in-person voting during the COVID-19 pandemic, which required an "unusual and in fact unnecessary chance with your life … simply to vote"). And those difficulties must be assessed "in light of the adequate" measures under the State's "election code" to facilitate voting. *Burdick*, 504 U.S. at 438-39. "Election laws will invariably impose some burden upon individual voters," but that doesn't make every burden constitutionally suspect. *Id.* at 433. New Hampshire makes it easy for its residents to register and to vote. The Court should thus dismiss Counts 1 and 2.

## B.  Idiosyncratic burdens on same-day registration don't state an *Anderson-Burdick* claim.

Plaintiffs' *Anderson-Burdick* claims fail for another reason: they focus on idiosyncratic burdens of voters who wait until election day to register to vote. But election-day registration is a privilege that States can condition or remove entirely. That HB 1569 might make election-day registration more difficult does not mean that it burdens "the right to vote." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1262

(11th Cir. 2020). Even if the Constitution prohibited burdens on election-day registration, Plaintiffs can't rely on "special burden[s]" that "may be placed on a limited number of persons." *Crawford*, 553 U.S. at 199 (plurality op.). Both are independent reasons to dismiss Plaintiffs' *Anderson-Burdick* claims.

**1.** Start with the fact that same-day registration is a privilege, not a right. "[A] person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680 (1973). The Constitution is not concerned with burdens on statutory privileges. It prohibits only unjustified "burdens" on "the right to vote." *Burdick*, 504 U.S. at 438. If "the statute does not burden the right to vote, [the Court] cannot engage in that kind of review" under the *Anderson-Burdick* test. *Jacobson*, 974 F.3d at 1262. For that reason, the Supreme Court has rejected claims that certain conditions on absentee voting are unconstitutional. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). When States impose limits on absentee voting, but not in-person voting, "[i]t is … not the right to vote that is at stake … but a claimed right to receive absentee ballots"—which is not a constitutional right. *Id.* Plaintiffs' complaints that HB 1569 burdens election-day registration fail for a similar reason. New Hampshire need not provide same-day registration at all, let alone provide further accommodations for voters who wait until the last day to register.

Indeed, New Hampshire's election-day registration rules are generous compared to other States. Over half of the States don't permit *any voter* to register on election day.[3] Most of those States close registration well in advance of election day. Oregon, for example, closes registration twenty-one days before the election. *See* Or.

---

[3] *Same-Day Voter Registration*, Nat'l Conf. of State Legislatures (Updated Oct. 25, 2024), www.ncsl.org/elections-and-campaigns/same-day-voter-registration.

Rev. Stat. §247.025. Massachusetts closes registration ten days before the election. *See* Mass. Gen. Laws ch. 51, §26. Other States such as New York permit voters to register on the day they vote, but only during the early voting period. *See* N.Y. Election Law §8-604. That New Hampshire accommodates voters with election-day registration makes the State's elections *less* burdensome, not more. *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (describing how the "numerous avenues" available to voters undercut claims that the system is burdensome).

The minority of States that do provide election-day registration have similar or even stricter requirements than New Hampshire. Idaho, Iowa, Nevada, and New Mexico, for example, all require photo identification for applicants seeking to register on election day, with no accommodation for provisional ballots if a voter lacks the required documents. *See* Idaho Code §34-408A; Iowa Code §48A.7A; Nev. Rev. Stat. §293.5847; N.M. Stats. §1-4-5.7. Minnesota requires identification and documentary proof of residence for applicants attempting to register on election day, with no provisional-ballot opportunity if the applicant doesn't have the proper evidence. *See* Minn. Stat. §201.061. Connecticut permits same-day registration only at locations specifically designated for the purpose. *See* Conn. Gen. Stat. §9-19j(c). That "the laws and experience of other states" require similar or stricter election-day registration practices is good evidence that New Hampshire's rules do not violate the Constitution. *Ohio Democratic Party*, 834 F.3d at 629; *see also Common Cause R.I.*, 970 F.3d at 15 (comparing Rhode Island's witness-signature requirement to "other states" that "have such a rule").

Far from being evidence that HB 1569 burdens the right to vote, that New Hampshire "afford[s]" its residents "privileged voting opportunities" such as election-day registration favors upholding the law. *Ohio Democratic Party*, 834 F.3d at 629. New Hampshire would be well within constitutional bounds if it eliminated election-day registration entirely, as evidenced by the majority of States that don't offer that privilege. HB 1569 doesn't do that. New Hampshire also wouldn't violate the constitution by imposing conditions on election-day registration. *See McDonald*, 394 U.S. at 807. HB 1569 doesn't even do that. Rather, HB 1569 sets the same rules for all voters, "whether the applicant seeks to register before election day or on election day." N.H. Rev. Stat. §654:12(I). Plaintiffs demand more. They claim that New Hampshire should *further* accommodate applicants who wait "to register to vote on election day," to reduce the chance that they fail "to obtain the documents in time to vote." Compl. ¶81. But "the inability of a small proportion of otherwise eligible individuals to meet the registration deadline" cannot "transform[] that deadline into a severe burden on First and Fourteenth Amendment rights." *ACORN*, 413 F. Supp. 2d at 148. That New Hampshire provides registration through election day undercuts Plaintiffs' claims that applicants have insufficient time to register to vote.

**2.** Even if Plaintiffs could sustain their *Anderson-Burdick* claims based on burdening the privilege of same-day registration, they can't rely on the idiosyncratic burdens faced by only some voters. As the Eleventh Circuit recently explained—quoting Justice Scalia's concurrence in *Crawford*—courts "'have to identify a burden before [they] can weigh it.'" *Jacobson*, 974 F.3d at 1261 (quoting *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment)). Plaintiffs focus on burdens that are legally "irrelevant" because they are "special burden[s] on some voters," not

categorical burdens on "*voters generally*." *Crawford*, 553 U.S. at 204, 206 (Scalia, J., concurring in the judgment) (cleaned up).

When plaintiffs challenge "generally applicable, nondiscriminatory voting regulation[s]," the burdens arising from "the peculiar circumstances of individual voters" are legally "irrelevant." *Id.* at 204-06. The *Anderson-Burdick* test is concerned only with burdens that affect voters "categorically." *Id.* at 206. This categorical approach is required by "adherence to precedent." *Id.* at 204. For example, in holding that Hawaii's ban on write-in voting "impose[d] only a limited burden on voters' rights," the Supreme Court looked at the ban's effect on voters generally, rather than on the plaintiff specifically. *Burdick*, 504 U.S. at 436-39. In fact, it was the dissent in *Burdick* that focused on the law's impact on "some individual voters." *Id.* at 448 (Kennedy, J., dissenting). And in rejecting a challenge to Oklahoma's primary election, the Court emphasized that "Oklahoma's semiclosed primary system does not severely burden the associational rights of the state's citizenry" generally—irrespective of its specific effect on the individual plaintiffs. *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). *Storer v. Brown* likewise held that the "sever[ity]" of California's ballot-access requirements must be assessed based on "the nature, extent, and *likely* impact" of those requirements—not the known impact on the specific candidates who were plaintiffs. 415 U.S. 724, 738 (1974) (emphasis added).

Justice Scalia's *Crawford* opinion accurately describes the governing law. As he explained, the categorical approach comes from several Supreme Court precedents—all good law, all binding. *See Crawford*, 553 U.S. at 206-07 (Scalia, J., concurring in the judgment). The plurality opinion "neither reject[ed] nor embrace[d]" the categorical approach. *Id.* at 208. It didn't need to because the plaintiff there failed

to "provide any concrete evidence of the burden" that the law imposed "on any class of voters." *Id.* at 201-02 (plurality op.). Several courts have thus followed Justice Scalia's concurrence as an accurate statement of the law. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020); *Jacobson*, 974 F.3d at 1261; *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1327 (11th Cir. 2021); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 663 (6th Cir. 2016) (Keith, J., concurring in part, dissenting in part) ("The Majority relies in part on Justice Scalia's concurrence in *Crawford*").

The correct, categorical approach to *Anderson-Burdick* is fatal to Plaintiffs' claims. Nothing in their complaint alleges in "non-conclusory" terms that HB 1569 imposes meaningful burdens on "voters generally." *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *9 (D. Minn. Mar. 29, 2021). Plaintiffs focus entirely on the peculiar burdens allegedly imposed on certain subclasses of voters. *E.g.*, Compl. ¶¶30, 38, 44, 48-53, 74, 77-82. That some applicants might "undergo a legal name change" or wait "to register to vote on election day" does not mean that New Hampshire's registration rules are to blame for their trouble. Compl. ¶¶81-82. "Burdens of that sort arising from life's vagaries … are neither so serious nor so frequent as to raise any question about the constitutionality" of identification requirements. *Crawford*, 553 U.S. at 197 (plurality op.). This "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal.*, 837 F.3d at 631. The better view is that it's prohibited.

**C.    The State has strong interests in ensuring that only eligible voters are registering to vote.**

Even if Plaintiffs had identified a burden on the right to vote, the State has numerous weighty interests in "seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Plaintiffs challenge "neutral, nondiscriminatory regulation[s]" of the voting process, *Crawford*, 553 U.S. at 203 (plurality op.), under which "[v]oters must simply take reasonable steps and exert some effort," *New Ga. Project*, 976 F.3d at 1282. Plaintiffs cannot show that the minimal effort required during the registration process is unjustified by the State's interests.

At a minimum, New Hampshire's interests include conducting orderly elections, enhancing public confidence in election integrity, and guarding against voter fraud. These interests "need not be 'compelling.'" *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (quoting *Burdick*, 504 U.S. at 439). But they are anyway. *See Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) ("The states' compelling interests include maintaining fairness, honesty, and order, minimizing frivolous candidacies, and 'avoiding confusion, deception, and even frustration of the democratic process.'" (citations omitted)). Plaintiffs claim that there's "no State Interest" justifying the laws. Compl. 34. But they focus on the State's interest in preventing voter fraud, ignoring the other compelling state interests. These are "weighty reasons that warrant judicial respect." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

To start, HB 1569 promotes the orderly administration of New Hampshire elections. "A State indisputably has a compelling interest in preserving the integrity

of its election process." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). Ensuring election integrity requires "running an orderly, efficient election and … giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id.* Simplifying the registration steps is the most obvious method of ensuring orderliness and efficiency for election officials. And "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* at 196. Affidavits are a fundamentally different form of evidence from documentary proof. So the "interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.*

Public confidence is another independent interest. Although the State's interest in public confidence "is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197 (plurality op.). But when courts issue "orders affecting elections," particularly by invalidating democratically enacted election procedures, they necessarily interfere with legislatively enacted election rules, which can "result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). And the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *Purcell*, 549 U.S. at 4, and courts should defer to legislatures on how best to assure voters and encourage democratic participation, *see Crawford*, 553 U.S. at 196

(plurality op.). These interests are compelling as a matter of law, but Plaintiffs don't allege they aren't present here.

The State also has a compelling interest in preventing fraud, the only interest Plaintiffs address in their Complaint. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* Indeed, "[t]he State's interest is particularly strong with respect to efforts to root out fraud." *Doe v. Reed*, 561 U.S. 186, 197 (2010) (emphasis added). That's because "fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).

Plaintiffs incorrectly suggest that the State must provide "credible evidence" that it "has experienced widespread voter fraud" to justify election regulations. Compl. ¶90. The Supreme Court has debunked that notion. State legislatures have legitimate interests in guarding against fraud even when the "record contains no evidence of any such fraud." *Crawford*, 553 U.S. at 194 (plurality op.). In part that's because "the long, uninterrupted and prevalent use of these statutes makes it difficult for States to come forward with the sort of proof" Plaintiffs demand. *Burson v. Freeman*, 504 U.S. 191, 208 (1992) (plurality op.). By its very nature, "election fraud [is] successful precisely because" it is "difficult to detect." *Id.* Requiring evidence also puts States in a Catch-22, because it "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). "States have thus never been required to justify their prophylactic measures to decrease occasions for vote fraud." *Richardson*, 978 F.3d at 240 (cleaned up). In any event, courts acknowledge as a matter of historical fact that "[v]oting fraud is a serious problem in U.S. elections

generally." *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (collecting sources).

Michigan's experience this past election cycle highlights some of the tangible problems that HB 1569 solves. Like New Hampshire, Michigan allows residents to register on election day. *See* Mich. Comp. Laws §168.497. And like New Hampshire prior to HB 1569, Michigan permits voters to satisfy the citizenship requirement with an affidavit. *See id.* §168.495(f), (g). During early voting last year, a Chinese citizen attending the University of Michigan allegedly registered during early voting and cast a ballot.[4] The Secretary of State issued a public statement acknowledging felony charges filed against the student.[5] As a result, the Michigan legislature is now considering proof-of-citizenship requirements for voters.[6] New Hampshire is a step ahead in closing the loophole presented by an affidavit honor system. And it's entitled to rely on "flagrant examples of such fraud in other parts of the country [that] have been documented throughout this Nation's history." *Crawford*, 553 U.S. at 195 (plurality op.).

New Hampshire must be particularly vigilant of these loopholes. "Fraud can affect the outcome of a close election," *Brnovich*, 141 S. Ct. at 2340, and New Hampshire often has close elections. As outlined by the General Court in earlier legislation on voter affidavits, "over the past 45 years, New Hampshire has had 44 state elections that ended in a tie or in a one-vote victory." Act of June 17, 2022, 2022

---

[4] Steve Carmody, *Non-US Citizen Faces Felony Charges After Allegedly Voting in Ann Arbor*, WDET (Nov. 1, 2024), perma.cc/LW45-A8RB.

[5] *Joint Statement of Secretary Benson and Washtenaw County Prosecutor Savit on Charges Filed in Noncitizen Voting Case*, Mich. Dep't of State (Oct. 30, 2024), perma.cc/DRJ7-UEYW.

[6] Hayley Harding, *Michigan House Committee Advances Proof-of-Citizenship Requirement for Voters*, Votebeat Mich. (Mar. 11, 2025), perma.cc/6M7Q-86E8.

N.H. Laws, ch. 239 (S.B. 418). "On average, that is almost once per year, not including the 1974 U.S. Senate race that was won by 2 votes—the closest U.S. Senate race in history." *Id.* Prophylactic measures are particularly appropriate given New Hampshire's unique experience with close elections. Just one or two voters taking advantage of the loopholes closed by HB 1569 could flip an election. The "Legislature [is] not obligated to wait" for that "to happen" before acting to deter fraud. *Brnovich*, 141 S. Ct. at 2348.

Relatedly, "successful elections" do not tie the State's hands from ensuring continued election integrity. *Contra* Compl. ¶91. The Eleventh Circuit recently reversed a district court that cited "high voter confidence in Florida's 2020 election" as undercutting the State's interest in deterring and detecting fraud. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). "Even if there were no evidence of voter fraud in Florida, our precedents would not require it before [an election-integrity] bill … could be adopted." *Id.* (citing *Crawford*, 553 U.S. at 194-96; *Brnovich*, 594 U.S. at 686).

In the end, "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "*Anderson* does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause/Ga.*, 554 F.3d at 1353 (citing *Anderson*, 460 U.S. at 796-806). That's particularly true when the State asserts a "legitimate interest" that "is settled beyond hope of contradiction." *Barr*, 626 F.3d at 111. New Hampshire's interests in election orderliness, confidence, and integrity "obviously are compelling." *Burson*, 504 U.S. at 199. This case is thus "one of the 'usual' variety in which the 'State's important regulatory interests justify

reasonable, nondiscriminatory restrictions.'" *Libertarian Party*, 826 F.3d at 721 (cleaned up) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

## II.    Plaintiffs do not have freestanding claims under the Due Process or Equal Protection Clauses.

Each of Plaintiffs claims should be assessed under the *Anderson-Burdick* test. The First Circuit "review[s] all of the First and Fourteenth Amendment claims" on "constitutional election law issues" "under the sliding scale approach announced by the Supreme Court in *Anderson v. Celebrezze*, and *Burdick v. Takushi*." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 8, 14 (1st Cir. 2011) (citations omitted). Courts applying that rule address due-process claims as coextensive with the *Anderson-Burdick* framework. *See Ariz. Democratic Party*, 18 F.4th at 1195. And when the "Plaintiffs' claim fails under that framework," their "procedural due process claim" fails with no further analysis necessary. *Id.* "[T]he Supreme Court's extensive jurisprudence on challenges to voting restrictions" cannot be "discarded merely by raising the same challenge under the banner of procedural due process." *Id.*

The same is true of Plaintiffs' equal protection claim. Count 4 of Plaintiffs' Complaint is also a "Fourteenth Amendment claim[]" on "constitutional election law issues" that is addressed "under the sliding scale approach announced by the Supreme Court in *Anderson v. Celebrezze*, and *Burdick v. Takushi*." *Libertarian Party of N.H.*, 638 F.3d at 8, 14. After all, whether the election regulation is "reasonable" and "nondiscriminatory" is built into the *Anderson-Burdick* test. *Anderson*, 460 U.S. at 788. So "[w]hen a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters," courts "review the claim using the 'flexible

standard' outlined in [*Anderson*] and [*Burdick*]." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012).

*Bush v. Gore* claims are a unique type of equal protection claim. Plaintiffs cite *Bush v. Gore*, but they don't plead a *Bush v. Gore* claim. *See* Compl. ¶119. Those claims are difficult to plead, because that case was "limited to the present circumstances" before the Court. *Bush v. Gore*, 531 U.S. 98, 109 (2000) (per curiam). The case concerned "the special instance of a statewide recount under the authority of a single state judicial officer" that possessed no standards by which to determine voter "intent" when examining ambiguously marked ballots. *Id.* at 105-06, 109. This case concerns voter registration, not ballot counting. And HB 1569 establishes uniform statewide standards for challenged-voter affidavits. *See* N.H. Rev. Stat. §659:27 ("Upon receipt of a written challenge, the moderator shall determine if the challenge to the ballot is well grounded. If the moderator determines that it is more likely than not that the challenge is well grounded, the moderator shall not receive the vote of the person so challenged. If the moderator determines that the challenge is not well grounded, the moderator shall permit the voter to vote."); *see also id.* §659:27-a (detailing additional challenge procedures).

In any event, Plaintiffs admit that their equal protection claim is "properly evaluated under the *Anderson-Burdick* framework described" in Counts 1 and 2. Compl. ¶120. That admission is reason enough to dismiss Plaintiffs' equal protection claim as duplicative of their *Anderson-Burdick* claims. Because "the standards applicable under those specific constitutional provisions control this court's disposition" under the *Anderson-Burdick* test, Plaintiffs' due process and equal protection claims are "essentially redundant" of their *Anderson-Burdick* claims. *See*

*Lamy v. N.H. Dep't of Corr. Comm'r*, No. 1:21-cv-229, 2022 WL 2670390, at *6 (D.N.H. June 14, 2022), *report and rec. adopted*, 2022 WL 2669533. Counts 3 and 4 are thus "duplicative and should be dismissed for the reasons applicable" to Counts 1 and 2. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Plaintiffs' complaint.

This 21st day of March, 2025.　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　／s／ *Richard J. Lehmann*

Thomas R. McCarthy*　　　　　　　Richard J. Lehmann
Gilbert C. Dickey*　　　　　　　　(Bar No. 9339)
Conor D. Woodfin*　　　　　　　　6 Garvins Falls Road
CONSOVOY MCCARTHY PLLC　　　CONCORD, N.H. 03301
1600 Wilson Boulevard, Suite 700　(603) 731-5435
Arlington, VA 22209　　　　　　　rick@nhlawyer.com
(703) 243-9423
tom@consovoymccarthy.com

*pro hac vice* forthcoming
　　　　　　　　　　　*Counsel for amici*