UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Coalition for Open Democracy et al.

      v.                                                  Case No. 24-cv-312-SE
                                                         Opinion No. 2025 DNH 085
David Scanlan et al.

O R D E R

Several organizations and individuals bring suit against the New Hampshire Secretary of State and the New Hampshire Attorney General seeking a declaratory judgment that the provisions of 2024 New Hampshire House Bill 1569 (HB 1569) violate the United States Constitution. The plaintiffs request injunctive relief barring state officials from implementing those provisions. The defendants move to dismiss the case, arguing that the plaintiffs lack standing to assert their claims and that, even if they do have standing, the complaint fails to state a plausible claim for relief. The plaintiffs object. The court held a hearing on the motion during which counsel for the plaintiffs, the defendants, and Amici Parties[1] offered oral argument. After careful consideration, the court grants in part and denies in part the defendants' motion.

Standard of Review

Although review of a motion for "a Rule 12(b)(6) dismissal for failure to state a claim and review to ensure the existence of standing are conceptually distinct, the same basic principles apply in both situations." Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016); see Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). "Just as the plaintiff bears

---

[1] The Amici Parties are the Republican National Committee and the New Hampshire Republican State Committee.

the burden of plausibly alleging a viable cause of action, so too the plaintiff bears the burden of pleading facts necessary to demonstrate standing." Hochendoner, 823 F.3d at 730 (citation omitted). "Each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" Id. (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). Thus, the court applies "the plausibility standard applicable under Rule 12(b)(6) to standing determinations at the pleading stage." Id.

To review the sufficiency of the claims under that standard, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013). The court must employ a two-step approach. First, it must identify and disregard statements that "merely offer 'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678 (alterations omitted)). Second, the court must credit as true all nonconclusory factual allegations and the reasonable inferences drawn from those allegations. See id. Only then can the court determine whether the "combined allegations, taken as true, . . . state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010).

Likewise, to assess standing, the court must "accept as true all well-pleaded factual averments in the . . . complaint and indulge all reasonable inferences therefrom." In re Financial Oversight and Management Board for Puerto Rico, 110 F.4th 295, 308 (1st Cir. 2024) (alteration and citation omitted). The plaintiffs "'need not definitively prove [their] injur[ies] or disprove the

[defendants'] defenses,' but need only 'plausibly plead on the face of [their] complaint' facts

supporting standing." Id. (quoting Tyler v. Hennepin Cnty., 598 U.S. 631, 637 (2023)).


Background

On September 12, 2024, then-New Hampshire Governor Chris Sununu signed into law

HB 1569, which went into effect on November 11, 2024. HB 1569 made several changes to New

Hampshire's requirements relating to voter registration and identification that the plaintiffs

allege violate the United States Constitution.

Specifically, before HB 1569 became effective, a prospective voter could register to vote

by establishing her citizenship, identity, and age, either by presenting documentary evidence,

including "any other reasonable documentation," or, if she did not possess the necessary

documentation, by executing a Qualified Voter Affidavit. Voters who submitted the Qualified

Voter Affidavit attested to their qualifications under the penalties of voter fraud and perjury. HB

1569 eliminated the Qualified Voter Affidavit. A prospective voter now must present

documentary evidence, including "any other reasonable documentation," that establishes her

citizenship, identity, and age.[2] See New Hampshire Revised Statute Annotated (RSA) § 654:12,

I. If a prospective voter is unable to present such documentation, she will not be able to register

to vote.

HB 1569 also changed the procedures related to voter-qualification challenges. Under

New Hampshire law, if a voter challenges the qualifications of any other voter registered in the

town or ward in which the election is held, see RSA 666:4, the moderator must determine if it is

"more likely than not" that the challenge to the voter's qualifications is "well grounded," RSA

---

[2] "Reasonable documentation" is not defined in the statute.

659:27. Before HB 1569 became effective, if the moderator determined that the challenge was more likely than not well grounded, the prospective voter could still cast an eligible ballot by using a Challenged Voter Affidavit, sworn under the penalties of voter fraud and perjury. HB 1569 eliminated the right to vote by Challenged Voter Affidavit. Instead, if the moderator deems the challenge more likely than not well grounded, the prospective voter must seek immediate relief in the New Hampshire Superior Court and can only cast a vote if the court overturns the moderator's decision prior to the close of the polls. RSA 654:12, V.

Three organizations and five individuals bring this suit challenging the constitutionality of HB 1569's provisions.[3] They allege that HB 1569's elimination of the Qualified Voter Affidavit constitutes an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments (Count I). They allege that HB 1569's elimination of the Challenged Voter Affidavit also constitutes an unjustifiable burden on the right to vote (Count II), violates voters' rights to procedural due process (Count III), and violates voters' rights to equal protection under the law (Count IV).

The three organizations (together, the Organizational Plaintiffs) are: Coalition for Open Democracy (Open Democracy), League of Women Voters of New Hampshire (League of Women Voters), and the Forward Foundation. The five individuals (together, the Individual Plaintiffs) are: McKenzie Nykamp Taylor; December Rust; Miles Borne, by his next friend Steven Borne; Alexander Muirhead, by his next friend Russell Muirhead; and Lila Muirhead, by her next friend Russell Muirhead.

Open Democracy is a non-profit organization whose "mission is to bring about and

---

[3] As discussed further below, it appears from the allegations in the complaint and representations made during oral argument that certain plaintiffs do not assert every claim alleged in the complaint.

safeguard political equality for the people of New Hampshire." Doc. no. 1, ¶¶ 21-22. The organization "pursues its mission through a variety of services that aim to assist prospective voters with exercising their voting rights and educate them about registration requirements and how to vote either through absentee ballots or in person." Id., ¶ 23. These services include, among other things, working with students to operate voter registration drives in approximately two dozen high schools across New Hampshire, as well as attending "community events across the state, communicating with constituents about voting and providing information and assistance." Id., ¶¶ 25, 28. Through its outreach efforts, the organization has come across many voters who lack documentary proof of citizenship for a variety of reasons, including that their documents were destroyed in fires or are in a distant location and thus inaccessible. Open Democracy also pursues its mission by protecting qualified voters from unnecessary burdens on election day. Volunteers for the organization recruit, train, and serve as poll workers and poll observers. Their duties include assisting individuals whose votes have been challenged.

League of Women Voters is a non-profit organization whose "mission is to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy." Id., ¶¶ 33-34. To further this mission, the organization develops and distributes educational materials about elections and how its members can vote. Often, the organization's volunteers communicate directly with unregistered voters, informing them what they must do in order to register.

The Forward Foundation is a non-profit organization whose mission is to "increase the participation of working-age people in democracy, enabling the next generation to thrive." Id., ¶¶ 39-40. The organization pursues this mission through voter education and outreach programs directed at prospective voters in both the general public and specific communities with lower historical voter turnout. In addition to distributing educational materials, the organization also

produces television and digital ads. The Forward Foundation also recruits, trains, and deploys poll workers who "ensure that every election runs smoothly and that all eligible voters' ballots are counted." Id., ¶ 45.

McKenzie Nykamp Taylor is a U.S. citizen who lives and is registered to vote in Manchester, New Hampshire. Currently, none of the documents that proves her citizenship accurately reflects her name because she recently married and changed her surname from St. Germain to Taylor.[4] Taylor plans to move in the near future and, if she moves to a residence in a different ward in Manchester or in a different municipality, she may need to re-register to vote.

December Rust is a U.S. citizen who lives and is registered to vote in Littleton, New Hampshire. Rust has been unhoused for approximately one year. He does not currently possess his birth certificate or passport. Rust expects that he may be asked to leave Littleton in the near future because he is unhoused and there have recently been rising tensions between the town and the unhoused population there. If so, he expects that he will need to re-register to vote.

Miles Borne, Alexander Muirhead, and Lila Muirhead are each minor U.S. citizens who live in New Hampshire. They will each turn 18 before the end of 2026 and intend to register to vote as soon as they do so.[5]

---

[4] At the hearing on the motion to dismiss, the plaintiffs' counsel informed the court that since the complaint was filed, Taylor has updated the documents proving her citizenship to accurately reflect her marital name. For the purpose of the standing analysis, however, the court considers the facts at the time the complaint was filed. See Castro v. Scanlan, 86 F.4th 947, 953-54 (1st Cir. 2023).

[5] At the hearing on the motion to dismiss, the plaintiffs' counsel informed the court that since filing the complaint, Miles Borne has turned 18. Again, the court considers the facts at the time the complaint was filed. See Castro, 86 F.4th at 953-54.

<u>Discussion</u>

The defendants move to dismiss the case in its entirety. They argue that none of the

plaintiffs has standing to assert any claim in this case. They also contend that even if any of the

plaintiffs has standing, the complaint does not allege a plausible claim for relief. "[B]ecause

standing is a prerequisite to a federal court's subject matter jurisdiction and [it] must assure

[itself] of [its] jurisdiction under the federal Constitution before [it] proceed[s] to the merits of a

case," the court begins by addressing the defendants' standing arguments. Dantzler, Inc. v.

Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) (quotations and

citation omitted).


I.    <u>Standing</u>

"Standing doctrine assures respect for the Constitution's limitation of '[t]he judicial

Power' to 'Cases' and 'Controversies.'" Hochendoner, 823 F.3d at 731 (quoting U.S. Const. art.

III, § 2, cl. 1). "For there to be a case or controversy under Article III, the [plaintiffs] must have a

personal stake in the case—in other words, standing." Town of Milton v. Fed. Aviation Admin.,

87 F.4th 91, 95 (1st Cir. 2023) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021)

(further quotations omitted)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is

concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion, 594

U.S. at 423. When a case, like this one, is in a pre-enforcement posture, a plaintiff must allege

that its harm is "certainly impending" or that it faces a "substantial risk" of injury. Reddy v.

Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S.

149, 158 (2014)); see Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013).

Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023) (quoting TransUnion LLC, 594 U.S. at 431).[6]

### A.    The Organizational Plaintiffs

"When an organization . . . seeks to establish Article III standing, it may proceed in one of two ways: it may show that it has 'organizational standing' to sue on its own behalf, or it may demonstrate that it has 'associational standing' to sue on behalf of its members." Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 738 F. Supp. 3d 1, 7 (D.D.C. 2024); see Equal Means Equal v. Ferriero, 3 F.4th 24, 29 (1st Cir. 2021). Here, although the defendants devote a substantial portion of their memorandum in support of their motion to the Organizational Plaintiffs' purported failure to establish associational standing, the plaintiffs state in their objection that they "do not rely on associational standing at this time." Doc. no. 45 at 5 n.1. Therefore, the court addresses only whether the Organizational Plaintiffs have organizational standing to pursue their claims.

The defendants argue that the complaint does not plausibly allege that HB 1569 has caused or will cause the Organizational Plaintiffs a cognizable injury.[7] The plaintiffs, of course, disagree, and assert that that the complaint alleges that they have suffered a concrete and particularized injury in fact under a theory of standing derived largely from Havens Realty

_____

[6] Although the court must analyze each plaintiff's standing to pursue every individual claim, as discussed further below, none of the plaintiffs has standing to pursue Count IV for identical reasons. Therefore, for ease of reading, the court addresses each plaintiff's standing to assert Counts I-III before turning to Count IV.

[7] The defendants effectively concede that the Organizational Plaintiffs have alleged the remaining two factors of the standing analysis if the court determines that they have sufficiently alleged an injury in fact. See doc. no. 36-1 at 20.

Corporation v. Coleman, 455 U.S. 363 (1982). The defendants acknowledge Havens Realty but argue that it does not support the Organizational Plaintiffs' theory of standing, relying on the Supreme Court's more recent holding in Food & Drug Administration v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024).

In Havens Realty, the defendant (Havens) allegedly engaged in a practice called racial steering, giving prospective home renters and buyers false information to direct them toward housing near others of the same race and away from housing near individuals of other races, thereby maintaining racial housing segregation. 455 U.S. at 366 & n.1. Several plaintiffs, including a housing organization called HOME, which provided housing counseling and referral services to prospective buyers and renters, sued Havens, alleging a violation of the Fair Housing Act. Id. at 367.

The Supreme Court held that HOME had organizational standing to pursue its claim because the complaint alleged that Havens's "steering practices . . . perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers." Id. at 379. The Supreme Court stated that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." Id.

Recently, the Supreme Court clarified Havens Realty's holding. In Alliance for Hippocratic Medicine, several anti-abortion medical organizations sought to challenge a Food and Drug Administration action that eased regulations related to mifepristone, a drug used to terminate pregnancies. 602 U.S. at 376-77. The organizations relied on a Havens Realty theory to establish standing, alleging that the FDA had "impaired their ability to provide services and achieve their organizational mission" and that they had to "divert[] [their] resources in response

9

to" the FDA's actions. Id. at 394-95 (quotations omitted). The Supreme Court rejected this

argument, re-affirming that mere issue advocacy, even when accompanied by expenditures,

could not alone establish standing. Id. at 395. Distinguishing Havens Realty, the Court

highlighted that HOME "not only was an issue-advocacy organization, but also operated a

housing counseling service." Id. So, "when Havens gave . . . false information about apartment

availability," it "directly affected and interfered with HOME's core business activities" because

it "impaired HOME's ability to provide counseling and referral services . . . ." Id. The Supreme

Court noted that the plaintiffs in Alliance for Hippocratic Medicine did not allege that the FDA's

action "imposed any similar impediment to the [plaintiffs'] advocacy business" and, therefore,

they lacked standing. Id.

The question before the court, then, is whether the Organizational Plaintiffs have alleged

that HB 1569 will directly affect and interfere with their core business activities. Id. If they have,

then they have adequately alleged standing under Havens Realty. With that legal framework

established, the court now turns to the specific factual allegations regarding standing for each

Organizational Plaintiff for each claim.

### 1.    Open Democracy

#### a.    Count I

Count I alleges that HB 1569 would impose an unjustifiable burden on the right to vote

by eliminating the Qualified Voter Affidavit. The complaint states that "without the availability

of a Qualified Voter Affidavit, many eligible voters who lack ready and timely access to

documentary proof of citizenship would be denied the right to register and vote in elections."

Doc. no. 1, ¶ 97. "Other New Hampshire residents would have to incur substantial new costs to

obtain the documents necessary to access the franchise under HB 1569. These changes introduce

significant new burdens on the right to vote in New Hampshire." Id. "HB 1569 would also harm Organizational Plaintiffs because it would . . . directly harm their ability to provide their core services, and will require Organizational Plaintiffs to dedicate more resources toward efforts to assist voters who are forced to navigate the burdensome restrictions imposed by the requirement to present documentary proof of citizenship." Id., ¶ 98.

The complaint alleges that one of Open Democracy's core business activities is voter registration. Specifically, Open Democracy works with students to operate voter drives in several high schools across New Hampshire, helping to register eligible high school students. Doc. no. 1, ¶ 25. These students are regularly unable to bring birth certificates or passports to the voter drives as proof of citizenship. Id. Prior to HB 1569, Open Democracy could and did help the students register using the Qualified Voter Affidavit. Id.

Now, HB 1569 would interfere with Open Democracy's voter registration assistance services because the organization would struggle to assist students when they lack immediate access to documentary proof of citizenship. Id. This harm is not merely speculative. During a registration drive at Exeter High School "after HB 1569 was introduced but before it was signed into law, a supervisor of the checklist turned away students who lacked documentary proof of citizenship without offering the option to sign a Qualified Voter Affidavit because of her belief that HB 1569's strict regime would take effect soon." Id. Because Open Democracy has alleged that eliminating the Qualified Voter Affidavit "directly affect[s] and interfere[s] with [its] core business activit[y]" of registering high school students to vote, Hippocratic Med., 602 U.S. at 395, and has alleged facts sufficient to establish that the interference is actual or imminent, the organization has standing to bring Count I.

11

b.    Counts II and III

Counts II and III address the elimination of the Challenged Voter Affidavit. Count II alleges that the elimination of the Affidavit is an unjustifiable burden on the right to vote because it "would strip voters of the right to vote based on ad hoc challenges from other voters and the subjective determinations of supervisors and moderators, adding further barriers and confusion to a convoluted registration process that has led to disenfranchisement." Doc. no. 1, ¶ 102. Count III alleges that the elimination of the Affidavit denies voters their procedural due process rights because "HB 1569 . . . does not provide adequate procedures in the likely case of [moderators'] erroneous determinations of ineligibility." Id., ¶ 111.

As with the elimination of the Qualified Voter Affidavit, the elimination of the Challenged Voter Affidavit interferes with one of Open Democracy's core services—here, recruiting, training, and deploying poll observers and poll workers, some of whom help voters whose eligibility will be challenged at the polls. Id., ¶¶ 31-32. Without the Challenged Voter Affidavit, Open Democracy will need to recruit more poll observers and enhance their training to counteract the burden to challenged voters (Count II) and the related decline in protective procedures that voters have (Count III), further draining organizational resources. Id., ¶ 32. It will also need to shift volunteers who would otherwise serve as poll workers to serve as poll observers. Id. Thus, the elimination of the Challenged Voter Affidavit affects and interferes with Open Democracy's core business activities. Hippocratic Med., 602 U.S. at 395; see Get Loud Ark. v. Thurston, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024) (expending resources to counteract an Election Commission Rule, including "retraining and hiring additional staff," which "compromised [the plaintiff's] ability to engage in other organizational activities," was sufficient to establish standing in voting rights case). The complaint also adequately alleges that voting challenges will occur due to the history of challenges seeking to disenfranchise young

12

voters in New Hampshire college towns. <u>See</u> doc. no. 1, ¶ 32. As a result, Open Democracy faces

a "substantial risk" of injury with regard to the removal of the Challenged Voter Affidavit. <u>SBA</u>

<u>List,</u> 573 U.S. at 158.

For these reasons, Open Democracy has standing to assert Counts II and III.


2.    <u>League of Women Voters</u>

League of Women Voters communicates directly with unregistered, eligible voters,

educating them about how to register to vote, to further its mission of "encourag[ing] informed

and active participation in government, increas[ing] understanding of major public policy issues,

and influenc[ing] public policy through education and advocacy." Doc. no. 1, ¶¶ 34, 37.

Sometimes these communications involve a prospective voter who does not possess a birth

certificate, a passport, or naturalization papers. For example, League of Women Voters has

encountered several New Hampshire senior citizens whose births were never recorded on an

acceptable birth certificate. <u>Id.</u>, ¶ 36. In addition, the organization's president recently spoke with

an eligible voter who had naturalization papers that only contained her premarital name. <u>Id.</u>,

¶ 37. The complaint alleges that League of Women Voters will be unable to "provide clear

information on how to register to vote as part of its preexisting core voter education services,"

<u>id.</u>, because HB 1569 eliminated the Qualified Voter Affidavit and because it is not clear what

"other reasonable documentation," RSA 654:12, I, suffices to prove citizenship, age, and

identity. Indeed, the difficulty presented by this ambiguity was highlighted during oral argument

on the defendants' motion to dismiss when the defendants' own counsel was unable to state with

certainty what "other reasonable documentation" he possessed that would be sufficient to allow

him to register to vote if he could not produce his passport or birth certificate. Doc. no. 72 at

101-03 (hearing transcript).

In light of the uncertainty surrounding what constitutes "other reasonable documentation," League of Women Voters has adequately alleged that its ability to advise prospective voters regarding how to register "as part of its preexisting core voter education services," doc. no. 1, ¶ 37, will be impaired and that the injury is substantially likely to occur. See SBA List, 573 U.S. at 158; Reddy, 845 F.3d at 500; see also Republican National Committee v. North Carolina State Bd. of Elections, 120 F.4th 390, 397 (4th Cir. 2024) (state action that inhibited committee's ability to "counsel voters to support Republican candidates" caused injury sufficient to confer standing because it affected and interfered with organizational mission); Get Loud Ark., 748 F. Supp. 3d at 653. For these reasons, League of Women Voters has standing to challenge the elimination of the Qualified Voter Affidavit as alleged in Count I.

Neither the complaint nor the plaintiffs' objection to the motion to dismiss appears to assert that the elimination of the Challenged Voter Affidavit affects League of Women Voters' core business activities. See doc. no. 1, ¶¶ 33-38; doc. no. 45 at 10-11. To the extent that the plaintiffs intended to assert Counts II and III on League of Women Voters' behalf, they have not shown that League of Women Voters has standing to pursue those claims.

### 3.    Forward Foundation

The Forward Foundation is a non-profit organization that seeks to increase the participation of working-age people in democracy. As part of its core services, the Forward Foundation engages in "nonpartisan voter education and outreach programs, which focus on empowering communities with lower voter engagement, including new U.S. citizens, communities of color, and working-age people who have recently moved to New Hampshire." Doc. no. 1, ¶ 41. It conducts "direct outreach to prospective voters in the general public," focusing on events geared toward underrepresented communities in New Hampshire. Id. These

14

include "multicultural and pride events across the state, in the North Country and other under-served areas, and at community colleges." Id. The Forward Foundation also operates poll worker recruitment and training programs. Id., ¶ 45.

As was the case with League of Women Voters, the Forward Foundation is "unsure how to clearly educate or effectively assist such voters" following HB 1569's elimination of the Qualified Voter Affidavit because the organization does not know what could qualify as "other reasonable documentation which indicates the applicant is a United States citizen." Id., ¶ 43. The Forward Foundation's core business activity of direct voter outreach and education is particularly affected by the elimination of the Qualified Voter Affidavit because its "core constituencies—including new U.S. citizens, residents who have newly moved to New Hampshire, young people, and communities of color—are among those most likely to be disenfranchised by HB 1569 if they are not offered effective education and assistance services." Id., ¶ 44.

Reading these allegations in the light most favorable to the plaintiffs, the Forward Foundation is substantially likely to suffer an injury because of HB 1569's elimination of the Qualified Voter Affidavit. As with League of Women Voters, HB 1569 impairs the Forward Foundation's ability to advise prospective voters regarding how to register, which is one of its core functions. Therefore, the Forward Foundation has standing to assert Count I.

The Forward Foundation also seeks to establish standing to challenge the elimination of the Challenged Voter Affidavit in Counts II and III. The complaint alleges that HB 1569 harms the Forward Foundation's poll worker recruitment and training services. Specifically, the complaint alleges that elimination of the Challenged Voter Affidavit will disenfranchise voters, and that it would be "substantially harder for [the Forward Foundation] to recruit volunteer poll workers because its constituencies do not want to serve in a role that makes them complicit in the

15

disenfranchisement of their fellow eligible citizens." Doc. no. 1, ¶ 46. The complaint also alleges that elimination of the Challenged Voter Affidavit would force it to "divert substantially more volunteers toward partner organizations that train poll observers, which harms The Forward Foundation's core poll worker recruitment services." Id., ¶ 47.

These allegations are not sufficient to show that the Forward Foundation has standing to bring Counts II or III. Unlike the allegations concerning Open Democracy, the complaint does not adequately allege that the elimination of the Challenged Voter Affidavit directly interferes with the Forward Foundation's core business activities of recruiting, training, and deploying poll observers and poll workers. As discussed above, the complaint alleges that Open Democracy will need to expend additional resources to add and train poll observers, either by recruiting more volunteers or shifting its resources from poll working to poll observing. In contrast, the Forward Foundation's claim that it will be unable to recruit volunteer poll workers because volunteers will not want to enforce HB 1569 relies on "conjecture" and is based on "third parties' subjective" feelings. Clapper, 568 U.S. at 417 n.7. The Supreme Court has rejected this theory of standing. Id. Further, the allegation that the Forward Foundation would suffer an injury by choosing to transfer its volunteers to other organizations that do poll watching is far "too attenuated to establish standing." Hippocratic Med., 602 U.S. at 390. Therefore, the complaint does not allege that the Forward Foundation will suffer a cognizable injury as the result of HB 1569's elimination of the Challenged Voter Affidavit. The Forward Foundation does not have standing to bring Counts II or III.

B.    Individual Plaintiffs

The defendants likewise argue that none of the Individual Plaintiffs has standing to assert any of the claims in the complaint. They contend that the complaint fails to allege that the

Individual Plaintiffs will suffer an actual or imminent injury. They also argue that even if the complaint includes those allegations, it does not allege that the defendants are the cause of the injury or that the injury would likely be redressed by judicial relief.

### 1.    McKenzie Nykamp Taylor

The plaintiffs allege that HB 1569 will injure Taylor because it eliminates the Qualified Voter Affidavit. They concede that "HB 1569 should not, by its terms, apply to those already registered in New Hampshire who are transferring their registration to a different municipality within the state." Doc. no. 45 at 15. They nevertheless contend that the elimination of the Qualified Voter Affidavit will injure Taylor if a particular sequence of events occurs. Taylor may be required to re-register to vote because of her surname change and her intention to move. Doc. no. 1, ¶¶ 48, 83-84. Although a polling location could confirm her prior registration, an election day worker must be able to access the state's voter registration database to make such confirmation. Id., ¶ 83. The plaintiffs allege that only a limited number of election day officials have access to the database, id., and the parties agreed during oral argument that some New Hampshire clerks and registrars have stated that they "often have difficulty with wireless connectivity at [their] polling place," doc. no. 45-1 at 11. Without access to the database, polling locations will likely require voters who relocate to present documentation necessary to satisfy HB 1569, including documentary proof of citizenship. Doc. no. 1, ¶ 84. The plaintiffs further allege that Taylor has not formally updated her U.S. passport, New Hampshire driver's license, or other identifying documents to reflect her desired surname change and will not be able to provide proof absent use of a Qualified Voter Affidavit. Id., ¶ 48.

Taylor's theory of injury is too speculative. First, the plaintiffs allege that Taylor and her family plan to move, but they do not allege that she will move to a residence that is zoned for a

different polling location. Id. Rather, the complaint alleges possible developments "if her new residence is in a different ward in Manchester or in a different municipality." Id. Second, even if she had made such an allegation, she would only suffer an injury if officials at her voting location lack access to the voter registration database, which is uncertain at best. That "chain of contingencies," Clapper, 568 U.S. at 410, is too "conjectural or hypothetical" to confer standing, Reddy, 845 F.3d at 500. For these reasons, Taylor does not have standing to assert Count I.

The allegations regarding Taylor are directed entirely at HB 1569's effect on her ability to register to vote. As such, Taylor appears to assert a claim under Count I only, which challenges the elimination of the Qualified Voter Affidavit. To the extent that the plaintiffs intended to assert Counts II and III on Taylor's behalf, they have not shown that she has standing to pursue those claims.

### 2.    December Rust

The complaint alleges that, like Taylor, Rust will be injured by HB 1569 because it eliminates the Qualified Voter Affidavit. Although Rust is currently registered to vote in Littleton, New Hampshire, he "expects to be required to move to another location within the state in the next year, especially given increased tensions in the town seeking to have law enforcement restrict camping by unhoused individuals." Doc. no. 1, ¶ 49. If he moves outside of his ward, he may need to re-register if election officials do not have access to the voter registration database. Id. In that scenario, he would be burdened because he would lack access to the necessary documentation to prove his citizenship. Id.

Like Taylor, Rust's alleged injuries are too speculative to confer standing to assert Count I. Rust does not allege that he will move outside of his current ward. He alleges only that he expects to be required to move, and that there would be difficulties registering "[i]f he moves

outside his current ward." Id. And, like Taylor, Rust would only suffer an injury under those circumstances if officials at his new voting location lack access to the voter registration database, which is equally speculative. These allegations are insufficient to show that Rust faces a substantial risk of injury, and he does not have standing to assert Count I. See Clapper, 568 U.S. at 410.

Rust also asserts Counts II and III, which are based on the elimination of the Challenged Voter Affidavit. The complaint alleges that Rust faces "an increased likelihood of facing a voter challenge" because of the "stigma against unhoused individuals" and the related "doubts and confusion amongst community members about whether he is a resident of Littleton." Doc. no. 1, ¶ 50. Rust's situation, he alleges, is exacerbated by the fact that his "Non Driver ID Card" is expired and indicates he is from another town, which would make it difficult for him to prove his voter eligibility. Id.

Again, under Supreme Court precedent, Rust's injuries are too speculative to confer standing to bring a claim based on the elimination of the Challenged Voter Affidavit. He alleges that, as an unhoused individual, he "has had repeated conversations with other residents of Littleton who routinely question whether he has sufficient connections to the town. Unfortunately, he has had to continuously reassert that he belongs in the town and in New Hampshire." Id. But those allegations do not make it "substantially likely" that Rust is going to face a challenge to his qualifications on election day. The complaint does not allege that Rust has ever faced a challenge before or that unhoused individuals have historically faced more voter challenges than other individuals. In other words, Rust's "alleged injuries are all conditioned on" an unidentified community member challenging his vote, and the complaint specifies "no concrete or imminent threat of" any community member doing so. Reddy, 845 F.3d at 502. "So the threat" of a challenged vote "remains 'hypothetical,'" given the allegations in the complaint.

Id. (quoting SBA List, 573 U.S. at 158). As such, Rust does not have standing to assert Counts II or III.

### 3.    Miles Borne, Alexander Muirhead, and Lila Muirhead

Miles Borne, Alexander Muirhead, and Lila Muirhead (the Minor Plaintiffs) are each minor U.S. citizens who live in New Hampshire. They will each turn 18 before the end of 2026 and intend to register to vote as soon as they do so. They all assert Count I, alleging that HB 1569's elimination of the Qualified Voter Affidavit will cause them injury because they will be required to locate and present either a birth certificate or a U.S. passport upon registering to vote. Doc. no. 1, ¶¶ 51-53.

Unlike Taylor and Rust, the Minor Plaintiffs have alleged an injury sufficient to confer standing to assert Count I. The complaint alleges that each of the Minor Plaintiffs plans to register to vote when they are eligible to do so. Because HB 1569 eliminates the Qualified Voter Affidavit, each of the Minor Plaintiffs will need to produce documentary proof of citizenship to register. The defendants conceded at oral argument that "even just pulling" a documentary form of citizenship "out of your back pocket" can create an injury sufficient to establish standing. Doc. no. 72 at 69; see Fish v. Schwab, 957 F.3d 1105, 1120 (10th Cir. 2020); Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351-52 (11th Cir. 2009). Further, because they intend to register to vote when eligible, the Minor Plaintiffs' injury is substantially likely to occur. Reddy, 845 F.3d at 500.

Nevertheless, the defendants contend that the Minor Plaintiffs' injury does not confer standing to assert Count I. They argue that, instead, to show an injury under this theory, the plaintiffs must allege that producing documentary proof of citizenship is more burdensome than an alternative means of proving citizenship, such as filling out a Qualified Voter Affidavit.

This argument conflates standing with the merits of the claim. As discussed further below, the magnitude of the burden HB 1569 imposes upon the plaintiffs is more properly analyzed in the context of a challenge to the merits of the plaintiffs' claims. See generally Fish, 957 F.3d at 1121-36. Standing does not require such a comparison point; instead, it "merely requires that the plaintiff be 'adversely affected' or 'aggrieved,' which can be established through 'an identifiable trifle.'" Sagar v. Kelly Automotive Gp., Inc., Civ. Action No. 21-cv-10540-PBS, 2021 WL 5567408, at *2 (D. Mass. Nov. 29, 2021) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n.14 (1973)); see Conservation Law Foundation, Inc. v. Academy Express, LLC, 129 F.4th 78, 86-87 (1st Cir. 2025). As the defendants have conceded, the Minor Plaintiffs have made this showing.

In addition to challenging the sufficiency of the Minor Plaintiffs' allegations of an imminent injury, the defendants also claim that the Minor Plaintiffs cannot satisfy the remaining prongs of the standing analysis. However, they offer no developed argument in support of that contention. Instead, they state simply that because the Minor Plaintiffs have not alleged a cognizable injury, it "follows, therefore, that injury cannot be fairly traceable to HB 1569, nor can the Court redress the alleged injury by a favorable decision." Doc. no. 36-1 at 27. Because the court has determined that the Minor Plaintiffs have alleged a cognizable injury, the defendants' argument is without merit. Nevertheless, for the sake of completeness, the court briefly addresses the remaining prongs of the standing analysis.

"The second and third standing requirements—causation and redressability—are often flip sides of the same coin." Hippocratic Med., 602 U.S. at 380 (quotation omitted). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." Id. at 381. The Minor Plaintiffs satisfy these prongs of the standing inquiry easily. HB 1569 eliminates the Qualified Voter Affidavit, which directly causes the

Minor Plaintiffs to incur an injury by requiring them to produce documentary proof of citizenship. As for the related redressability inquiry, a court order enjoining the elimination of Qualified Voter Affidavit would "redress the professed injur[ies]." Dantzler, 958 F.3d at 47.

For these reasons, the Minor Plaintiffs have alleged adequate facts to support all three prongs of the standing analysis as it pertains to Count I.

C.    Count IV

Count IV alleges that the elimination of the Challenged Voter Affidavit violates voters' equal protection rights under the Fourteenth Amendment. Specifically, the complaint alleges that:

> HB 1569 arbitrarily treats New Hampshire voters differently solely based on the subjective and variable determinations of moderators on election day. HB 1569 requires moderators to determine whether it is "more likely than not that the challenge is well grounded, the moderator shall not receive the vote of the person so challenged." HB 1569 § 3(II). The bill also allows moderators to determine what is considered "reasonable documentation" for the purpose of establishing voter registration requirements. HB 1569 § 1(I). Without more definite standardization, these determinations by various moderators in the thrust of election day would be disparate across polling places, arbitrarily discriminating against New Hampshire voters through inconsistent application of the law. This creates arbitrary and disparate treatment among New Hampshire voters.

Doc. no. 1, ¶ 121.

Again, to establish Article III standing in the pre-enforcement context, there must be a "substantial risk that harm will occur," Reddy, 845 F.3d at 500 (quotations omitted), or the "threatened injury must be *certainly impending*" and "allegations of *possible* future injury are not sufficient," Clapper, 568 U.S. at 409 (cleaned up). Further, a plaintiff "cannot manufacture standing by incurring costs in anticipation of non-imminent harm." Clapper, 568 U.S. at 422. Yet, this is precisely what the plaintiffs have attempted to do in Count IV.

Although they allege that moderators in various polling places would have different standards for determining when a voter challenge is well grounded and what is considered "reasonable documentation" to establish voter registration requirements, the plaintiffs allege no facts to support those allegations. Indeed, RSA 659:27 has always allowed moderators to determine if it is "more likely than not" that the challenge to a voter's qualifications is "well grounded." And RSA 654:12 has always allowed a prospective voter to establish her citizenship, identity, and age with "reasonable documentation." Yet the plaintiffs do not allege that moderators have previously applied these standards differently depending on their polling locations. Without any factual allegations to support the claim that moderators in different towns will apply the relevant standards differently, Claim IV ultimately rests entirely on speculation about the decisions of independent third parties. Although the absence of those factual allegations is understandable given the previous availability of the Challenged Voter Affidavit, the court will not "abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." Clapper, 568 U.S. at 414.

For these reasons, none of the plaintiffs has standing to bring Count IV. Therefore, Count IV is dismissed as to all plaintiffs.


D.    <u>Summary</u>

For the reasons discussed above, the Organizational Plaintiffs and the Minor Plaintiffs have standing to assert Count I. Open Democracy has standing to assert Counts II and III. None of the plaintiffs has standing to assert Count IV.

II.    Merits

The defendants also argue that the plaintiffs' complaint fails to state viable claims for relief and that the court should dismiss the complaint in its entirety. Because the court has determined that no plaintiff has standing to assert Count IV, the court addresses the defendants' arguments as to the remaining counts only.

A.    Counts I and II

As discussed above, the plaintiffs allege that HB 1569 unjustifiably burdens the right to vote in violation of the First and Fourteenth Amendments by eliminating the Qualified Voter Affidavit (Count I) and the Challenged Voter Affidavit (Count II). The parties agree that election law challenges such as these are analyzed under the so-called Anderson-Burdick framework. See Anderson v. Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992). Anderson-Burdick requires the court to "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" Common Cause Rhode Island v. Gorbea, 970 F.3d 11, 14 (1st Cir. 2020) (per curiam) (quoting Anderson, 460 U.S. at 789); see Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008). To determine the burdens placed on voters, the court looks to "the statute's broad application to all . . . voters," as well as the "'limited number of persons' on whom '[t]he burdens that are relevant to the issue before [the court]' will be 'somewhat heavier.'" Fish, 957 F.3d at 1127 (ellipsis in original) (quoting Crawford, 553 U.S. at 202-03, 198-99).

The defendants argue briefly that the plaintiffs have not "identified the character or magnitude of the alleged burdens to themselves or their members in complying with HB 1569's requirements." Doc. no. 36-1 at 31. That argument ignores the adequately-pleaded burdens

24

discussed throughout the complaint. See, e.g., doc. no. 1, ¶¶ 6, 7, 9, 13, 25, 37, 73-84, 88-89. The Amici Parties expand on the defendants' argument, adding that the plaintiffs' claims in Counts I and II fail because "they rely on idiosyncratic burdens on voters who wait until election day to register; and any alleged burdens are outweighed by the State's compelling interests in election integrity and security." Doc. no. 56 at 5. Specifically, the Amici Parties contend that the elimination of the Affidavits is either not a burden or is, at worst, an "idiosyncratic burden" on election-day registrants because: 1) the Constitution does not require New Hampshire to provide the Affidavits, and 2) most voters have documentary proof of citizenship "at the ready" or "they can get them quickly and easily." Id. at 3. Those arguments either misunderstand the Anderson-Burdick framework, misunderstand the plaintiffs' burden at the pleading stage, or both.

First, the fact that the Constitution does not require the Affidavits is irrelevant to the court's analysis. The Anderson-Burdick framework does not ask whether the challenged law strips away a voting procedure specifically guaranteed by the Constitution, of which there are very few. Rather, it asks whether a law places "burdens on citizens' rights to vote that are not reasonably justified by states' 'important regulatory interests.'" Common Cause Rhode Island, 970 F.3d at 14 (quoting Anderson, 460 U.S. at 788-89).

Second, the Amici Parties' arguments regarding the ease of obtaining documentary proof of citizenship are, at best, not appropriate at this stage of the litigation. The plaintiffs allege that millions of Americans lack access to documentary proof of citizenship, doc. no. 1, ¶ 76, and that there are significant costs, time, and difficulties associated with acquiring those documents, id., ¶¶ 78-80 (discussing fees and wait times to obtain a birth certificate, naturalization papers, or a passport). Although the Amici Parties describe these barriers as "minimal," doc. no. 56 at 5, 7, the cost of obtaining a birth certificate can be considered "a significant burden on the right to vote." Fish, 957 F.3d at 1131. Drawing all reasonable inferences in the plaintiffs' favor, they

have sufficiently alleged that HB 1569 substantially burdens the right to vote in New Hampshire. It is not appropriate at this stage of the litigation for the court to decide whether the plaintiffs or the Amici Parties are correct about the difficulty of obtaining documentary proof.

Turning to the Amici Parties' next argument, they contend that any alleged burdens on the right to vote are outweighed by the State's compelling interests in election integrity and security. Surely, "these interests [are] legitimate in the abstract." Fish, 957 F.3d at 1132. But the Anderson-Burdick framework "requires courts to conduct fact-intensive analyses," Gill v. Scholz, 962 F.3d 360, 365 (7th Cir. 2020), and the defendants must point to "concrete evidence that 'those interests make it necessary to burden the plaintiff's rights' in this case," Fish, 957 F.3d 1132 (quoting Burdick, 504 U.S. at 434). See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State, 716 F. Supp. 3d 1236, 1241 (N.D. Fla. 2024) (noting that "application of the Anderson-Burdick test is highly fact-dependent"); see generally Libertarian Party of NH v. Gardner, No. 14-cv-00322-PB, 2014 WL 7408214, at *4 (D.N.H. Dec. 30, 2014) (noting that challenges to voting restrictions are "fact-dependent," and "[w]ith no factual record" at the motion to dismiss stage, the court "cannot predict whether the [plaintiff] will be able to prove its claim that the law it challenges imposes a heavy burden" on the plaintiff). Where, as here, "the complaint alleges facts which, if true, tend to support the" plaintiffs' claims that HB 1569's elimination of the Affidavits unduly burdens the right to vote, that effectively "clinches the matter" at this stage in light of the "fact-specific nature of the relevant inquiry." Cruz v. Melecio, 204 F.3d 14, 22 (1st Cir. 2000) (citing Anderson, 460 U.S. at 789-90).

For these reasons, the defendants' motion to dismiss Counts I and II on the merits is denied.

26

B.    Count III

Count III alleges that the elimination of the Challenged Voter Affidavit violates voters' procedural due process rights under the Fourteenth Amendment. To allege a procedural due process claim, the plaintiffs must first "identify a protected liberty or property interest" and second, allege that the defendants "deprived [them] of that interest without constitutionally adequate process." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (quotation omitted); Swarthout v. Cooke, 562 U.S. 216, 219 (2011).

On the first prong, HB 1569's elimination of the Challenged Voter Affidavit implicates a protected liberty interest. "It is beyond dispute that '[t]he right to vote is of the most fundamental significance under our constitutional structure.'" Saucedo v. Gardner, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) (quoting Ayers-Schaffner v. Distefano, 37 F.3d 726, 727 (1st Cir. 1994)). As discussed, the complaint alleges that HB 1569's elimination of the Challenged Voter Affidavit burdens certain New Hampshire voters' right to vote.

To satisfy the second prong, the plaintiffs must allege that HB 1569 deprived them of that interest without constitutionally adequate process. "No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" González-Droz, 660 F.3d at 13 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). Nevertheless, at a minimum, due process guarantees that "before a significant deprivation of liberty," the plaintiff must have adequate notice of the deprivation and be "afforded an opportunity to be heard at a meaningful time and in a meaningful manner." Id. (quotation omitted).

Giving the plaintiffs all reasonable inferences, the complaint sufficiently alleges that HB 1569 does not afford voters adequate due process before depriving them of their vote because of the elimination of the Challenged Voter Affidavit. Under New Hampshire law, a local election

administrator must determine whether a challenge to a vote is more likely than not well grounded. The complaint plausibly alleges that challenged voters are unlikely to have notice that their vote will be challenged and so will be unprepared to rebut the challenge by, for example, carrying with them documentary proof of voter eligibility. Moreover, there is no specific guidance regarding how election officials are supposed to determine whether a challenge is more likely than not well grounded. See doc. no. 1, ¶ 110. The complaint sufficiently alleges that this undefined standard will lend itself to erroneous determinations of voter eligibility. See id., ¶ 87. Before HB 1569, the Challenged Voter Affidavit provided voters with a safeguard and allowed them to cast their vote under the penalty of perjury despite a local election official's adverse determination as to their eligibility to vote.

With the elimination of the Challenged Voter Affidavit, an affected voter's only recourse is to "take an immediate appeal" of an election official's adverse decision to the New Hampshire Superior Court. RSA 654:12, V. The availability to seek recourse from a state court is generally considered to be sufficient to satisfy due process. See Fusion Learning, Inc. v. Andover Sch. Committee, 609 F. Supp. 3d 5, 15 (D. Mass. 2022). But due process requires that a plaintiff have "reasonable time . . . to make [an] appearance" and an opportunity to present his objections before the state deprives him of a liberty. A.A.R.P. v. Trump, 605 U.S. ----, 145 S. Ct. 1364, 1367-68 (2025) (alterations in original) (quotations omitted). Here, the complaint plausibly alleges that the availability of an appeal to a superior court does not provide voters with that opportunity. The plaintiffs point to the practical barriers and costs associated with seeking review from the superior court, including a voter's need to draft and file a complaint and argue a case by himself by the end of the day on election day. See doc. no. 1, ¶ 112. They also allege that filing an action requires payment of a significant fee, id., ¶ 113, and that the process of obtaining relief from the courts would likely "be unfamiliar and daunting to most prospective voters," id., ¶ 88.

Giving the plaintiffs every reasonable inference, the complaint alleges that HB 1569 violates voters' procedural due process rights by eliminating the Challenged Voter Affidavit.

<u>Conclusion</u>

For the foregoing reasons, the court grants in part and denies in part the defendants' motion to dismiss the complaint (doc. no. 36) as provided in this order.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

July 29, 2025

cc:  Counsel of Record.